1     UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF KENTUCKY
2     CENTRAL DIVISION AT LEXINGTON

3        - - -
 HERDGUARD, LLC,     . Case No. 5:16-CV-00468
4          .
    Plaintiff,    .
5          . Lexington, Kentucky
    - v -     .
6          . Tuesday, March 26, 2019
 NXT GENERATION PET, INC.,  .
7          . **TESTIMONY OF**
    Defendant.    . **KENNETH STEWART**
8        - - -

9   EXCERPT OF TRANSCRIPT OF JURY TRIAL PROCEEDINGS
     BEFORE THE HONORABLE JOSEPH M. HOOD
10    UNITED STATES DISTRICT COURT JUDGE

11        - - -

12

13 For the Plaintiff:    ANDRE F. REGARD, ESQ.
          Regard Law Group, PLLC
14         234 North Limestone
          Lexington, Kentucky  40507
15
 For the Defendant:    PALMER G. VANCE, II, ESQ.
16         Stoll, Keenon Ogden, PLLC
          300 West Vine Street, Suite 2100
17         Lexington, Kentucky  40507

18 Court Reporter:     LINDA S. MULLEN, RDR, CRR
          Official Court Reporter
19         101 Barr Street
          Lexington, Kentucky  40507
20

21 Proceedings recorded by mechanical stenography, transcript
 produced by computer.
22

23

24

25

2

KENNETH W. STEWART - DIRECT

1       (Jury entered courtroom at 12:19 p.m.)

2       THE COURT:  Let the record reflect that our eight familiar

3  faces are back in the box.  We'll waive the poll of the jury.

4  You may be seated.

5       First witness, Mr. Regard.

6       MR. REGARD:  Thank you, Your Honor.

7       Herd Guard would like to call Mr. Stewart, please.

8       **KENNETH W. STEWART, PLAINTIFF, SWORN**

9       THE COURT:  You may ask.

10                          KENNETH W. STEWART

11                          DIRECT EXAMINATION

12  BY MR. REGARD:

13  Q.   Please state your name for the record.

14  A.   Kenneth W. Stewart.

15  Q.   Mr. Stewart, were you the founder of Herd Guard?

16  A.   Yes.

17  Q.   Can you please tell the jury what Herd Guard is.  The

18  company, first.

19  A.   The company is a manufacturer who supplies distributors

20  with products that they may infiltrate box stores, sporting

21  good stores, pet stores with a product line that has two

22  different lines together but the same products.  It's a

23  hunter-related odor control line with spray to repel ticks and

24  chiggers.  It's a natural product, a shampoo that strips the

25  oils off, makes you clean, which takes care of odor also.

3

KENNETH W. STEWART - DIRECT

1     The clothing detergent, it infuses the same product in it,

2  but cleans clothing.  It's hypoallergenic.  And it's very --

3  for people who have rashes and other things and, you know,

4  can't stand real strong detergents, it's real mild.  It was

5  used a lot in nursing homes and stuff like that.

6     But we infused a formula into the hunter line that took

7  care of the ticks and chiggers in a way of not killing them,

8  but it will ward them off.  They can't come in contact with it.

9     The pet line done the same, and it rids them of ticks and

10  fleas and kills the odor on pets and in their beds also.  And

11  it's also hypoallergenic.  The idea of this whole line was to

12  be scent free.  Pets don't like scent.  You know, put a shampoo

13  on a dog and it runs and sticks his head under the pillows,

14  it's because his senses are so strong that more than cleaning

15  him, it's aggravating him and he feels like -- he's sensitive

16  to it and he feels like you've done something to harm him when

17  that happens, especially a young pet.

18     So we tried to develop something for the pet line that

19  would help them with their sensitivity.  Very healing for dogs

20  that have been under stress or been mis -- not been taken care

21  of properly or abused in some way.  We want to do it with a

22  natural background.

23     Not all three products were natural, the laundry

24  detergents weren't.  But we were working with Vermont Soap to

25  change them over to a natural laundry detergent also,

KENNETH W. STEWART - DIRECT

1  experimenting.

2  Q.   Can you clarify for the jury the laundry detergent versus

3  the shampoo?

4  A.   Laundry detergent was created by a company and their

5  largest customer was hospitals.  And I just chose that as being

6  a quality product to wash their beds with.  And we made it

7  scent free also with our process, with our secret formula.

8  Q.   That was not a Vermont Soap product at the time?

9  A.   The bed linen was not.

10  Q.   When did you start marketing Body Guard 360?

11  A.   Around 2010.  There's a -- marketing and branding are kind

12  of two different things.  There's a lot of branding involved as

13  you're marketing before you find your first customer, actually.

14  Q.   Why don't you explain to the jury a little bit what you

15  mean by the difference between "branding" and "marketing."

16  A.   Well, anything you put on your body, you know, is a pretty

17  serious product.  And there's a lot of products out there that

18  had a lot of chemicals in them.  I thought if I could develop

19  something that was more on the natural side, number one, it

20  would be easier to sell to a customer because we're in a

21  society where people are more aware about what they eat, what

22  they drink, what they put on their bodies.  So I thought

23  seeking out natural products that worked would be the most

24  positive thing to do for a young company in this area.

25       I spent a lot of time doing research, which started in the

KENNETH W. STEWART - DIRECT

1   hunting industry.  I was a large outfitter in the state of

2   Kentucky taking people turkey hunting and deer hunting.  I had

3   a lodge and different things.

4       I tried to develop my own odor control so that I could use

5   it first on my own customers.  Because that's really a good

6   branding and backlog of how it works.  You know, you get your

7   customers in front of animals and they harvest animals and they

8   start talking about your scent control, then that gives you a

9   barrage of people that you can use in your marketing.

10  Pictures, all these different things you may have seen in

11  magazines.

12      So with the Body Guard, hunter was first.  And we were

13  going to buyer shows and marketing it and trying to get it into

14  the larger sporting goods shows.

15      And then when I realized what I had and how good it worked

16  and the background behind it, being a pet owner, you know,

17  dogs, cats, horses, everything on the farm, I started using

18  them on pets as a -- because it seemed to leave your body

19  squeaky clean.  And I thought, you know, most of the odor in a

20  pet is from its hair, its dander.  So we started washing.  And

21  it came kind of full force together accidentally.

22      And we just started getting great reviews from people who

23  were washing their pets with it that we knew with older dogs

24  that were sick and had odors and stuff.  And farm dogs, field

25  trial bird dogs, all this different stuff.  Kennel dogs mainly

6

KENNETH W. STEWART - DIRECT

1   for the flea things, because kennels have trouble with having

2   fleas in them.  So we used it a lot there, spraying it through

3   five-gallon sprayers, just drenching everything.  And the

4   results were always real positive and the odor control was

5   super positive.

6       At that point we realized that we don't have money to

7   market.  Branding on a national level is just so expensive, so

8   I was throwing everything I could find towards branding, and

9   then doing as many trade shows as I can to find buyers who buy

10  for stores, not the public.

11  Q.   Can you clarify that?  Because I'm sure that's going to

12  come up during the trial.

13      When you -- what is your definition of "buyer" when you

14  say a buyer?

15  A.   Well, there's -- you got an end user, which is a buyer,

16  but he's going to buy his product in a store somewhere.  The

17  buyers that I'm talking about would be a person -- and I'll

18  give you an example.

19      A large hardware store may have a person who goes to trade

20  shows where he has to have credentials to prove that he's not a

21  public person.  And then he has the ability there to walk

22  through the show and meet with different manufacturers and

23  purchase their products in quantities to ship to their stores.

24  That's the distributor or store-buyer level.

25  Q.   Would you go to shows that had distributors at them?

1  A.   Yes.   That would be the only shows that we went to with

2  the pet line, is those kind of large trade shows for buyers,

3  internationally even.

4  Q.   Are those shows open to the general public?

5  A.   No.   No, you have to be invited and have a pass.

6  Q.   Do you have a background in chemistry?

7  A.   No.

8  Q.   Do you have a background in consumer goods?

9  A.   Somewhat, but not in the pet industry, in the hunting

10 industry.

11 Q.   Do you have a background in manufacturing cosmetics or

12 soaps or anything like that?

13 A.   No, sir.

14 Q.   So tell the jury a little bit about the challenges, you

15 hinted on it, that you had as you started to develop the

16 company as a mom-and-pop company.

17 A.   Well, they were all challenges, really, from the

18 beginning.   We did in-house bottling.

19      Let me start at the beginning.   I was looking for products

20 that were real, had been used in other markets for other

21 things.   I figure without a chemistry background, I had to do

22 my homework and use the trickle-down investigation.   Start at

23 the top and go down to where it started.

24      And I found one of my products was -- had been used in

25 grain bins by the federal government to control insects with a

1    product that was -- could be consumed by humans.  I thought,

2    wait a minute.  Controls insects and a human can consume it, so

3    I started investigating it.

4        And when I got down to the fine science on it, I found out

5    that it really does what it says by testing it myself.  The

6    odor control wasn't a part of it, but I found out later by

7    testing with several methods, the biggest one was my own boots,

8    putting them by my wife's bed and asking her, did she smell

9    them, you know rubber hip or hunting boots.

10   Q.   You say odor control wasn't part of it.  I don't believe

11   you told the jury what was the focus at that point.  Before

12   odor control, was it about the fleas, was it about the

13   chiggers?

14   A.   The first order was to find a product that would keep

15   insects off of men.  I mean, the tick bites and all that stuff

16   was so prevalent.  And hunters are getting Rocky Mountain Fever

17   and all this stuff.

18       When I found out that it worked on insects, I thought,

19   well, this is pretty neat.  So I investigated more and found

20   out that any type of insect that had an exoskeleton would be

21   killed by it immediately coming in contact.  It starts a

22   laceration, they're single cell.  And they bleed out within

23   four hours.  And because it comes from the earth, they know

24   about it and they stay away from it.  We watch them steer clear

25   and go around it.

1       So just continued investigations, led to mixing it and

2  adding some more stuff to it that was very secret and

3  controlling odor with it.

4  Q.   Now, during Mr. Vance's opening he mentioned diatomaceous

5  earth.  Is that the product that you were investigating?

6  A.   Yes.  DE is the common name for it.

7  Q.   So did there come a time where you needed to find

8  additional funding for the company?

9  A.   Yes.

10 Q.   What did you do at that point?

11 A.   We got a couple European orders and some orders over

12 Puerto Rico, and different things occurred, and it let me know

13 then that it possibly could be a big deal.  And in order to

14 brand and market something that really works that's all natural

15 in two different industries is way above my league.  And I knew

16 that I could fund it and keep it going and fill small orders,

17 but I would never be able to finance it to the next level.

18 Q.   Now, you've used the word "all natural."  Did you promote

19 the product as certified organic as well?

20 A.   No, never certified organic.  There's natural and organic.

21 Diatomaceous earth comes from the ground, strictly out of

22 layers in the sea.  And if you look in a microscope, it's

23 similar to a million little small razor blades.  Crushed glass

24 down to microscopic size.  And it is organic.

25       But you have -- to take a product to the certification of

KENNETH W. STEWART - DIRECT

 1  organic, to put certified organic on the bottle, which that

 2  didn't interest me anyway because that limits your market so

 3  much, not everybody is looking for certified organic.  You can

 4  go to the grocery store and find it, but that aisle is empty.

 5  I wanted to be able to sell to everybody.  So organic was a way

 6  to start.

 7      The problem with it is, in order to be certified organic,

 8  the environment it's in has to be inspected.  I mean, there's

 9  so many steps to have it certified because of the environment

10  around it.

11      You could be in a factory using DE and somebody could walk

12  through that area and drop something, and then it's no longer

13  organic if something touches it.  You add water to it, it's no

14  longer organic.  Water, even distilled water, they won't

15  certify organic.

16      So we just went all natural.  It had been our plan from

17  the beginning and that's what we stuck with.  But we made some

18  labels that said organic and we changed those labels in just a

19  short period of time.  We just didn't want to go that route.

20  Q.   Did you ever say it was certified organic?

21  A.   Never.

22  Q.   Is it your understanding that's a different process than

23  organic?

24  A.   I'm positive it's a huge process.

25  Q.   Can you explain to the jury how Herd Guard developed a

11

KENNETH W. STEWART - DIRECT

1  relationship with Vermont Soap?  When I say "Vermont Soap," is

2  it your understanding that that's the daily nomenclature for

3  the Vermont Soap Corporation?

4  A.   Yes.  What you're saying is with Vermont Soap, but there

5  is Vermont soaps also, which is similar to Kentucky bourbon.  I

6  mean, it's noted in Vermont, the town, as being soap people,

7  soap makers of every kind.  It's huge.  I had to narrow down to

8  one company that I could do business with.

9  Q.   You started a relationship with Vermont Soap; is that

10  correct?

11  A.   Yes.

12  Q.   When did that start?

13  A.   2010.

14  Q.   Now, can you tell the jury how you first came to know

15  about NXT Generation Pet, Inc.?

16  A.   We were at the Orlando Pet Global Show.  It's the biggest.

17  It's the big daddy.  And I stretched out everything I could get

18  to get a booth there because I thought it was time to kind of

19  test the water and see how many people would come to me

20  internationally interested in our product, with beautiful

21  labeling, packaging.  And I thought we had everything just like

22  it should be to take a baby step and talk to some distributors.

23      I wasn't in the booth.  My wife, you know, had a really

24  nice way of talking to people and meeting people and showing

25  the products.  A lady approached her and did a demonstration

12

KENNETH W. STEWART - DIRECT

1    that we normally do.  We slice a yellow onion in half.  People

2    come through our booth, buyers, and they run their finger on

3    it.  And we spray it with our secret formula, which is not

4    Vermont's, what they were manufacturing, but we had three

5    products in our line.  The spray, shampoo and bed shampoo for

6    bedding.

7         So you spray their hand and the odor goes away and it

8    never comes back.  And the first thing they say is, wow, you go

9    to wake up the next morning and you still got onion on your

10   hand.  It's a cool product.

11        And if they've got a little bit of chemistry background or

12   they've read a lot, they see that diatomaceous earth is -- you

13   know, got a pretty good name.  The problem is the diatomaceous

14   earth, you got to get something to come to it and that's where

15   your other products come in.  At which point I'll atone, but

16   the odor control never leaves their mind, how did you do that,

17   how do you do that.

18        We -- after Helen Cantrell approached my wife and

19   discussed it with her, she mentioned that she knew a company

20   that was looking for new products and they had funding, but

21   they were just starting, they didn't have anything really

22   started yet.

23        And from there, she introduced to the other people

24   involved with NXT Generation.

25   Q.   Did you meet the other people at the actual expo?

KENNETH W. STEWART - DIRECT

1   A.   I didn't.  I had stepped out for a break.  It was a long

2   show, take turns taking breaks, manning our both.  And I never

3   spoke to one person from that company at the show.

4   Q.   When was the first time you spoke to a representative of

5   NXT?

6   A.   I'm kind of funny about divulging a lot of information to

7   somebody that I've not done business with, it's came back on me

8   a few times, my construction business.  And I just pretty much

9   told all of my staff and the people that work with me that,

10  don't bring somebody to me that isn't super interested in the

11  formula, not just the pet line or the name.

12       Jason called my wife and said that he was super interested

13  in the company, and he would like to have a direct conversation

14  with me.  And they arranged it.  And we talked.  That was the

15  first person I talked to within NXT Generation.

16  Q.   Mr. Stewart, I'm going to show you an exhibit which we

17  have previously marked as Exhibit 1.  You have a book right

18  here.

19       MR. REGARD:  May I approach the witness, Your Honor?

20       THE COURT:  Yes, sir.

21  BY MR. REGARD:

22  Q.   Giving you a three-ring binder that has all the exhibits

23  marked.  It also will be on your screen.  For the Court, we're

24  going to have to lay a foundation of what this is and then the

25  judge will decide whether or not he can show it to the jury.

KENNETH W. STEWART - DIRECT

1    So one moment, Mr. Stewart.

2         Can you turn to Exhibit 1, please.

3    A.   Yes.

4    Q.   All right.  Is Exhibit 1 a document that was produced by

5    Herd Guard?

6    A.   Yes.

7    Q.   And it was produced under your direction?

8    A.   Yes.  Several things here my daughter put together.

9    Q.   Okay.  We'll go through it in a little bit more

10   specificity.  But can you state to the Court that that

11   document, Exhibit 1, in fact is a document that was produced by

12   Herd Guard?

13   A.   Yes.

14        MR. REGARD:  Your Honor, we would move to show Exhibit 1

15   to the jury.

16        THE COURT:  Objection, Mr. Vance?

17        MR. VANCE:  No objection, Your Honor.

18        THE COURT:  You may do that.

19           (Plaintiff Exhibit 1 was admitted.)

20   BY MR. REGARD:

21   Q.   So, Mr. Stewart, what is Exhibit 1?  What was this

22   document created to do?

23   A.   Created to give an overall look at our company to

24   potential buyers.

25   Q.   When you say "potential buyers," was it produced for

KENNETH W. STEWART - DIRECT

1   potential investors?

2   A.   Yeah, the investor-type buyer, not the retail buyer.

3   Q.   And did you put a confidentiality mark on the actual

4   document?

5   A.   Yes.

6   Q.   Is that the confidentiality notice on the bottom of the

7   document?

8   A.   Yes.  We tried to do that on most all of our documents a

9   buyer would see.

10  Q.   If you turn to the second page of Exhibit 1 -- excuse me

11  for one second.

12       Can you turn to the third page of Exhibit 1?

13  A.   Uh-huh.

14  Q.   Is that a picture of your three products that you had

15  available at the time?

16  A.   Yeah, that's the 8-ounce bottles of spray, bed shampoo and

17  the pet laundry detergent.

18  Q.   And in your materials here, did you advertise any of it as

19  certified organic?

20  A.   No, not certified organic, we couldn't.  As a matter of

21  fact, the product on the left, it's definitely a chemical-based

22  laundry detergent.

23  Q.   On this document, you have a reference to Vermont natural

24  soaps.  Why did you add that reference to this document?

25  A.   This was the document that -- oh, why did we say Vermont

KENNETH W. STEWART - DIRECT

1   Soaps?

2   Q.    Yes.

3   A.    Just there's so many people in the marketplace that are

4   familiar with the soaps that are made in Vermont, especially in

5   the town of Middlebury.

6   Q.    And was this -- as you said earlier, was this a document

7   that you gave to the general consuming public?

8   A.    No.   It's got our different, you know, case cost, case

9   weights.   They're a couple pages in the back here that a person

10  wouldn't even get unless they were buying the company.   They

11  weren't in the original documents.

12  Q.    So if you go to the fourth page, it says "Product List."

13  Do you see that page?

14  A.    I'm sorry.   Let me back up.   Uh-huh.

15  Q.    The distributor cost, is that what Herd Guard would sell

16  to a distributor?

17  A.    Yes.

18  Q.    And then what's the dealer cost?

19  A.    Dealer cost would be, you know, what the dealer would

20  purchase it for, and then they would make their percentage.

21  And the cost next to it would be the MSRP, is what the store --

22  a manufacturer is supposed to control his product markup all

23  the way down the line to the end user.   And you try to extend

24  that to your buyers from the beginning.   And then they are able

25  to calculate, you know, the cost differences and the product

                                                                    17
                          KENNETH W. STEWART - DIRECT

1    differences from there.

2    Q.   And are there standards that you're aware of that are used

3    in the industry for a two-step markup?

4    A.   Yes, typically everybody likes to make 40 percent.  Can't

5    hardly get them to talk to you if they can't make 40.

6    Q.   Would that be 40 percent from the manufacturer to the

7    distributor?

8    A.   Yes.  And then sometimes there might not be a distributor

9    in the program and it would go straight to a buyer, like a

10   hardware store that had a thousand stores.

11   Q.   Would that be another 40 percent markup?

12   A.   They would make really good money because they had a

13   distributorship within their own retail store chain.

14   Q.   Is it your understanding that was standard in the industry

15   that you were in?

16        MR. VANCE:  May we approach, please.

17        THE COURT:  Please.

18        (Bench conference on the record.)

19        THE COURT:  Let the record reflect that the parties are

20   present at the bench outside the presence and hearing of the

21   jury.

22        MR. VANCE:  Judge, there have been no expert opinions

23   disclosed in this case, either by retained experts or by lay

24   witnesses.  What he's attempting to do with his question,

25   Mr. Stewart, is have him testify as to what industry standard

KENNETH W. STEWART - DIRECT                    18

```
 1    is in terms of markup, so he could then argue you apply that

 2    percentage to the sale or the purchases that NXT Generation had

 3    with Vermont Soap.  It's completely improper.

 4         There is no evidence in this case as to what NXT

 5    Generation Pet's actual markup were.  There is no evidence in

 6    this case, other than what Mr. Stewart may be purporting to --

 7    about to say as to what the industry standard is, and there's

 8    no indication Mr. Stewart himself has any expertise as to what

 9    the industry standard would be as to markups.  This is not the

10    type of evidence that would support that testimony.

11         MR. REGARD:  I'm asking him to provide testimony about the

12    markups that he used, Your Honor, based on the packages that he

13    produced.

14         THE COURT:  You can't say "industry standard."

15         MR. REGARD:  Okay.  I won't say "industry standard."

16         THE COURT:  You can't say "industry" because he's not

17    aware of it.

18         MR. REGARD:  That's fine, Your Honor.

19         MR. VANCE:  Thank you, Your Honor.

20         (Bench conference concluded.)

21    BY MR. REGARD:

22    Q.  Mr. Stewart, looking at page 4 of Exhibit 1, were those

23    the markups that you had proposed that Herd Guard would use for

24    its products?

25    A.  Yes.
```

KENNETH W. STEWART - DIRECT

1   Q.   And what percentages were those?

2   A.   40 percent.

3   Q.   Now, Mr. Stewart, can you look through the rest of the

4   exhibit, there's page 5.  Can you explain to the jury what

5   page 5 of the exhibit is?

6   A.   Went all the way through it and got messed up, I'm sorry.

7   Give me just a second.

8   Q.   I also have it on your screen.

9   A.   It went off.  There we go.  Those are POS, which is a

10  display you would put by the counter with your products in it.

11  And that was the cost of them in this -- the reason they're in

12  there, most buyers would want to see what your profit margins

13  are on your floor displays.

14  Q.   And if you could turn the page to the next page.

15  A.   COGS.

16  Q.   Can you explain to the jury what COGS is, or cost of goods

17  sold?

18  A.   Yeah, that's just for our costing.  But yet you would

19  never give this to anybody other than any -- a buyer, you know,

20  because that's the cost of your goods for the competitor.

21  Q.   You spoke a little quietly there.  Can you clarify what

22  you called the buyer just now?

23  A.   Well, what I'm confused -- I'm seeing things in this

24  package that is detailed strictly for a person who you were

25  selling to.  I mean, you're down to showing them what your cost

KENNETH W. STEWART - DIRECT

1   is per unit after it's packaged.

2   Q.   Is it your understanding that this package was provided to

3   NXT at some point?

4   A.   Yes.

5   Q.   Would you have provided this package to NXT before they

6   signed a nondisclosure agreement?

7   A.   No.

8   Q.   I would like for you to turn to the second-to-last page of

9   this exhibit, please.

10  A.   Okay.

11  Q.   The second-to-last page, it states Vermont Soap; is that

12  correct?

13  A.   Yes.

14  Q.   Does that document state that this is the list of your

15  Body Guard 360 pet suppliers?

16  A.   Yes.

17  Q.   Would you have provided this information to anybody who

18  did not sign a nondisclosure agreement?

19  A.   Absolutely not.  It actually lists who we are -- our

20  contacts, everything.  Yeah, no.  Absolutely not.

21  Q.   Do you recall having any conversations with a

22  representative of NXT before you signed a nondisclosure

23  agreement?

24  A.   Could you repeat that?

25  Q.   Do you recall having any conversations with Jason Riccardi

KENNETH W. STEWART - DIRECT

1  before you signed a nondisclosure agreement?

2  A.   Yes, two conversations.

3  Q.   What did you tell him during that conversation?

4  A.   Our conversation was more about my thoughts of what I was

5  doing and where I wanted to go.  They -- the girls told him

6  that I wouldn't talk to him about anything but what my future

7  was with the products, what I was looking for, and then discuss

8  the products theirself, only the packaging and just mild

9  things.

10     But we got into the discussion of the purchase on the

11  telephone at that point.  And I told him -- he asked me what I

12  wanted for the company.  Do I even want to sell the company.

13  And he asked me what criteria, you know, if I sold it to

14  somebody, you know, what did I want to do after that.  And we

15  just had that type of discussion.  We didn't discuss products,

16  what they do.  Nothing.

17     I did tell him on the spot, I was sitting in my truck

18  leaving my shop, that don't even come to me and talk to me

19  unless you got a million dollars to put up.  Because he

20  wanted -- you know, we had talked about the formula.  That's

21  what he was interested in, you know, killing odor.  And he had

22  told my wife something about a cat litter company and he kind

23  of got into that a little, they thought it would be a great

24  odor control in cat litter.  He had some connections, they were

25  merging, blah, blah, blah, that was it.  That was the last

KENNETH W. STEWART - DIRECT

1    conversation I had with him at that point.  And he had to do

2    the non-competes and everything before I would talk to him

3    about anything else.

4    Q.   When you told him you wanted a million dollars, was that

5    based on the current revenue of the company?

6    A.   No.  I clearly told him, you know, we're small.  We're

7    barely, you know, able to make it right now.  It was about the

8    formula.

9    Q.   Mr. Stewart, if you could please turn to Exhibit 2 in your

10   exhibit book there.  Should be a three-page document.

11   A.   I seen something that just alarmed me right now.  Could I

12   discuss it with you?

13   Q.   Just I want you to look at that.

14   A.   2?

15   Q.   What's marked as Exhibit 2, please.

16   A.   Okay.

17   Q.   Is Exhibit 2 the mutual nondisclosure agreement that you

18   signed with NXT?

19   A.   Yes.

20   Q.   Is that your signature on page 3?

21   A.   Yes, it is.

22        MR. REGARD:  Your Honor, I would move to admit Exhibit 2

23   into evidence and show it to the jury as the mutual

24   nondisclosure agreement.

25        THE COURT:  Objection?

KENNETH W. STEWART - DIRECT

1       MR. VANCE:  No objection.

2       THE COURT:  Let it be shown.

3           (Plaintiff Exhibit 2 was admitted.)

4  BY MR. REGARD:

5  Q.   Mr. Stewart, did you sign the mutual nondisclosure

6  agreement marked as Exhibit 2 on or about May 20th, 2015?

7  A.   Yes.

8  Q.   Is that your signature on the third page?

9  A.   Yes, it is.

10 Q.   If you turn to the second page of the mutual nondisclosure

11 agreement, can you look at paragraph 7, please.

12 A.   Yes.

13 Q.   Were you aware of paragraph 7 when you signed the mutual

14 nondisclosure agreement?

15 A.   Yes.

16 Q.   What was your understanding of paragraph 7?

17 A.   My understanding would be that neither parties could do

18 any business with the other parties' representatives,

19 manufacturers, stores, anything to do with the secrety of the

20 product, purchasing, buying, any meetings other than the one

21 that we would allow.

22 Q.   Now, do you know who drafted the mutual nondisclosure

23 agreement, which party, whether it was NXT or Herd Guard?

24 A.   This product was passed to us by NXT.

25 Q.   Did you disclose to any representative of NXT that Vermont

KENNETH W. STEWART - DIRECT                    24

1    Soap was a supplier of Herd Guard before you executed the

2    document which has been presented as Exhibit 2?

3    A.    No.   That was kept totally confidential.   And a lot of

4    reasons were that there was more products I was working with

5    them on to grow the Body Guard line.   And I would never divulge

6    that information without this signed.

7    Q.    What was the significance of developing other products?

8    A.    With the pet line, you could just -- there's a lot of

9    things that are made all natural that are just really good

10   products.   And the idea was to tap into that more.   So I

11   wouldn't let anybody else know where I had my shampoo made.

12   Q.    Did you have any discussions with Jason Riccardi as a

13   representative of NXT that you would get a royalty on future

14   products?

15   A.    Yeah.

16   Q.    Can you explain that to the jury, please.

17   A.    When -- after the NDAs were signed, at that point then we

18   started releasing some information on what we were doing.   And

19   I had a talk with him that one of our suppliers had many things

20   that I could help transition into the pet line.   And he

21   recommended that instead of a huge cash buyout, that I look at

22   my age and financial position with taxation, all the things, he

23   convinced me that a royalty package was, you know, really going

24   to be the best way for me to go with the amount of marketing

25   money and money they were going to put behind the product line

KENNETH W. STEWART - DIRECT

1   and the amount of sales that they would be able to create.

2   Q.   Did he tell you that you could not introduce other

3   products?

4   A.   No, he wanted to keep me as a liaison to develop and help

5   test and, you know, grow the company, the brand.

6   Q.   When you signed Exhibit 2, the NDA, did you understand

7   that to mean that Herd Guard could not do business with any of

8   the suppliers of NXT?

9        MR. VANCE:   May we approach, please?

10  A.   Yes.

11       THE COURT:   Approach, please.

12       (Bench conference on the record.)

13       THE COURT:   Let the record reflect that the parties are

14  present at the bench outside the presence and hearing of the

15  jury.

16       MR. VANCE:   Judge, Mr. Stewart's understanding of what the

17  contract says is not relevant.   What's relevant is what the

18  contract actually says.   And the jury then will make a

19  determination on the issues presented to them.   But his

20  understanding and interpretation, the Court interprets the

21  contract, not Mr. Stewart.

22       MR. REGARD:   I believe his common understanding of what he

23  was doing and what his restrictions are is a fair question,

24  Your Honor.

25       THE COURT:   It's what the contract says, it's not his

1   understanding.  What the contracts says.

2        MR. REGARD:  Okay.

3        MR. VANCE:  Thank you, Your Honor.

4        (Bench conference concluded.)

5        THE COURT:  You may continue.

6   BY MR. REGARD:

7   Q.   Mr. Stewart, did any representative of NXT ask you to

8   carve out any suppliers from the nondisclosure agreement?

9   A.   No.

10  Q.   Did they provide you any list of suppliers they were

11  already doing business with?

12  A.   No.

13  Q.   Did they provide you any list of suppliers they had

14  already researched?

15  A.   No.  No, the only thing they told me is we were like the

16  very first portion of their purchases and it was a great

17  foundation to build everything else off of, because our formula

18  could be introduced into many, many other products for odor

19  control in the pet industry.

20  Q.   Did anybody who represented NXT Generation tell you that

21  they were intending to do business with Vermont Soap?

22  A.   No, never.

23  Q.   After signing the nondisclosure agreement, did Herd Guard

24  disclose to NXT that Vermont Soap was a primary supplier?

25  A.   Yes.  I see a list in that last package that we give them

KENNETH W. STEWART - DIRECT                    27

1    after that was signed of our suppliers.

2    Q.    I'm sorry, do you want to go back to --

3    A.    Yeah, that's what I said.  I seen something alarming in

4    that last list, the very last page was something that you would

5    never give anybody.  It's actually our Amazon passwords and

6    stuff to our accounts in which, you know, we were -- we were

7    closing, the deal was done when they received that.

8    Q.    I'm sorry, Mr. Stewart.  What document are you talking

9    about?

10   A.    I'm talking about in the first exhibit, the last document.

11   This is our --

12   Q.    Are you talking about the Amazon information?

13   A.    Yeah.  I'm saying, you know, that's super, super pertinent

14   information.  You would never pass that to anybody.  That

15   was -- that is what gives them the information they needed

16   to -- that and the page before it.  Basically this was after

17   they said we're bought, to quit selling and everything's

18   getting ready to change.  I don't know how it got in that first

19   part of that document there.

20   Q.    Was that information provided to NXT at some point?

21   A.    Yes.

22   Q.    Mr. Stewart, I would like for you to turn to Exhibit 3.

23   Exhibit 3 appears to be an email from Jason Riccardi, and it's

24   cc'd Stewartcontract@yahoo.com.  Is that your email address?

25   A.    Yes, it is.

KENNETH W. STEWART - DIRECT

1   Q.    Did you receive this email?

2   A.    Yes, I did.

3   Q.    It's actually a chain of emails, encompasses four pages.

4   Do you see four pages?  I would like for you to go to the third

5   page.

6   A.    Okay.

7   Q.    That's from J. Riccardi.  And in the cc, it has

8   dad@Stewartcontracting.  Is that you?

9   A.    Yes.

10  Q.    Look on the second page, in the to/from line.  It also has

11  dad.  Would that be you?

12  A.    Yes.

13  Q.    Second page?

14  A.    I'm sorry.  Yes.

15  Q.    So did you receive this email in the normal course of

16  business?

17  A.    Yes, I did.

18          MR. REGARD:  Your Honor, I would move to admit Exhibit 3

19  as an email that Mr. Stewart received from Mr. Riccardi.

20          MR. VANCE:  Judge, can we approach for just a second?

21          THE COURT:  Approach.

22          (Bench conference on the record.)

23          THE COURT:  Let the record reflect the parties are present

24  by counsel at the bench outside the presence and hearing of the

25  jury.

KENNETH W. STEWART - DIRECT

1        MR. VANCE:  Judge, I'm not sure how far down the path

2   we're going to go with this, but this is getting into the terms

3   of the deal, which is really not an issue that's before the

4   jury or is going to be presented to the jury.

5        As I said earlier today, I realize that there is some

6   context that has to be provided, but when we start getting into

7   the terms of the payments and how much they were going to get

8   for this and what was that versus Deal 2, I think we're going

9   pretty far astray from what the issue is in the case.

10        MR. REGARD:  Your Honor, I'm not going to go much further

11   into the deal.  I just wanted to follow up on his comment about

12   the royalty.  Because one of the reasons he wanted to protect

13   Vermont Soap so much was because he knew he had other products

14   he could bring from Vermont Soap, and this document shows some

15   of the ideas, the royalties that he discussed.

16        THE COURT:  Okay.   I'm going to permit it.

17        MR. REGARD:  Thank you.

18        (Bench conference concluded.)

19        THE COURT:  Document admitted.

20             (Plaintiff Exhibit 3 was admitted.)

21        MR. REGARD:  Is it presented to the jury?

22        THE COURT:  Yes, sir.

23        MR. REGARD:  Thank you, Your Honor.

24   BY MR. REGARD:

25   Q.   Mr. Stewart, if you could turn to page 3 of Exhibit 3,

KENNETH W. STEWART - DIRECT

1    please.

2    A.    Okay.

3    Q.    You had mentioned earlier about getting some royalties.

4    Does the bottom of page 3 reflect one of the discussions that

5    you were having about royalties?

6    A.    Yes.

7    Q.    And it says you were to get a percentage of the margin up

8    to a certain percentage of sales; is that correct?

9    A.    Yes.

10   Q.    And then if you turn to page 1 of Exhibit 3.

11   A.    Okay.

12   Q.    On the email, there's a subsection 2.  Do you see that?

13   A.    Yes.

14   Q.    Can you tell the jury what your understanding was about

15   the benefit of the formula and how you were going to be

16   compensated?

17   A.    When he -- after our first conversation about the royalty,

18   Jason began to discuss how many different products that this

19   could go into and how the royalty payments would work.  And

20   that it would be included in all the sales calculations on top

21   of the actual royalties on the product line.

22   Q.    In your mind, did you associate those royalties and

23   formula use with your relationship with Vermont Soap?

24        MR. VANCE:  Object to form, Your Honor.  Leading.

25        THE COURT:  Sustained.

KENNETH W. STEWART - DIRECT

1   BY MR. REGARD:

2   Q.   How did you see the interaction between the use of your

3   formula and your relationship with Vermont Soap?

4   A.   Could you repeat that one more time?  I want to make sure

5   I answer correct.

6   Q.   Did you understand that your formula could be put into

7   other Vermont Soap products?

8   A.   Yes, definitely.

9   Q.   Was there a value to that for you?

10  A.   Yes, a huge value.

11  Q.   Is that one of the reasons you didn't disclose it to --

12  A.   That is the reason.

13  Q.   Mr. Stewart, I would like you to turn to Exhibit 4,

14  please.  Is it your understanding that Exhibit 4 was an asset

15  purchase agreement that was sent to Herd Guard by NXT?

16  A.   Yes.

17  Q.   Did you receive a copy of that agreement?

18  A.   Yes, I did.

19  Q.   Did Herd Guard or other representatives of Herd Guard

20  review the agreement?

21  A.   Yes.

22       MR. REGARD:  Your Honor, I would move to admit Exhibit 4

23  as a copy of the asset purchase agreement drafted by NXT and

24  sent to Herd Guard.

25       THE COURT:  Objection?

KENNETH W. STEWART - DIRECT

1         MR. VANCE:  May we approach?

2         (Bench conference on the record.)

3         THE COURT:  I'm going to wear the carpet out.

4         MR. VANCE:  Sorry.

5         THE COURT:  Let the record reflect that the parties are

6    present at the bench outside the presence and hearing of the

7    jury.

8         MR. VANCE:  Judge, I apologize for having to come back up

9    here, but the asset purchase agreement has nothing to do with

10   the issues in the case.  There is no dispute that the parties

11   did not reach an agreement.  This is a draft agreement.  It's

12   many pages.  And all it's going to do if it's introduced is

13   confuse the jury because it has nothing to do with anything

14   they're going to have to decide.

15        THE COURT:  Well, I already told the jury, I believe, that

16   what we limited them to was whether NXT was aware of Vermont

17   Soap prior to their discussions with Herd Guard.  So the

18   purchase agreement really doesn't have anything to do with what

19   we're doing here.

20        MR. REGARD:  Well, Your Honor, I'm just trying to show the

21   jury the basis for why it was so important for him to protect

22   his information.  And I guess my other general comment we

23   exchanged --

24        THE COURT:  He's already said that it was important for

25   him to protect his information.

KENNETH W. STEWART - DIRECT

1         MR. REGARD:  I understand.  But just for the record, I

2    guess we exchanged exhibit lists weeks ago, twice in this case,

3    and these objections weren't brought up then.  And I wouldn't

4    have prepared my witnesses in accordance with these documents

5    had I known these objections would be created, Your Honor.

6         MR. VANCE:  Well, I would just say in response to that,

7    the exhibit lists were filed before we knew what the issue was

8    that was going to be tried in the case.  So obviously, once you

9    know what the issue is, your exhibits are tailored to that.

10        THE COURT:  Yes, I think we have very little here.

11        MR. REGARD:  I'll pass on it, Your Honor.

12        THE COURT:  Just to make sure for the record, I think I've

13   tried to make it clear that my decision, as well as my advice

14   to the jury this morning, we are limited to what NXT knew about

15   Vermont Soap prior to them reaching the non- -- what's the

16   term, not the non-disclosure, but the other part too.

17        MR. REGARD:  Non-circumvention.

18        THE COURT:  Non-circumvention.  If they didn't -- if they

19   knew about it, knew about Vermont Soap, non-disclosure,

20   non-circumvention provisions are meaningless.  So what we need

21   to do is get focused on the issues we're here to try today.

22        MR. REGARD:  Thank you, Your Honor.

23        MR. VANCE:  Thank you, Your Honor.

24        (Bench conference concluded.)

25        THE COURT:  Let's move on.

KENNETH W. STEWART - DIRECT

1   BY MR. REGARD:

2   Q.   Mr. Stewart, could you please turn to Exhibit 6?  I would

3   like you to turn to the last page of Exhibit 6.  This is an

4   email from Crystal Ryan.  Who is Crystal Ryan?

5   A.   My daughter.

6   Q.   Was she working with Herd Guard in 2015?

7   A.   Yes, she was keeping the books and kind of put her in

8   charge of all the chain of emails and appointments and stuff

9   like that.

10  Q.   It's to Nichole LoPinto.  Who is Nichole LoPinto?

11  A.   She is my contact representative with Vermont Soap.

12  Q.   And it's cc'd to dad.  Is that you?

13  A.   Yes.

14  Q.   Okay.

15       MR. REGARD:  Your Honor  could we please admit Exhibit 6

16  as an email, second page?

17       MR. VANCE:  No objection.

18       THE COURT:  No objection, let it be filed and shown to the

19  jury.

20           (Plaintiff Exhibit 6 was admitted.)

21  BY MR. REGARD:

22  Q.   I've highlighted a section of that email where it says, so

23  it looks as if the acquisition for the pet line we have is

24  going through.  The buyer would like to schedule a time in the

25  next week to come take a tour of your facility, as well to see

KENNETH W. STEWART - CROSS

```
 1   if you all can bottle/produce the quantities that he will be
 2   needing.
 3        When this email was sent, did anybody at NXT tell you they
 4   had already had a relationship with Vermont Soap?
 5   A.   No.
 6   Q.   Did anybody from NXT acknowledge to you that they even
 7   knew who Vermont Soap was?
 8   A.   No.
 9   Q.   Did representatives of NXT go to Vermont Soap?
10   A.   Yes.
11        MR. REGARD:  I don't have any further questions, Your
12   Honor.
13        THE COURT:  Cross, Mr. Vance.
14        MR. VANCE:  Yes, Your Honor.
15                        CROSS-EXAMINATION
16   BY MR. VANCE:
17   Q.   Good afternoon, Mr. Stewart.
18   A.   Hi.  How are you?
19   Q.   I'm fine.  How are you today?
20   A.   I'm good.
21   Q.   Good.  I have just a few questions I'm going to ask you
22   today.
23        When you started doing business with Vermont Soap, by
24   "you" I mean Herd Guard, isn't it true that you found out about
25   Vermont Soap by doing an internet search?
```

1   A.   I found out about Vermont Soaps, the city in Vermont, by

2   doing an internet search.

3   Q.   Well, isn't it also true, though, that you found the

4   Vermont Soap Company by doing an internet search?

5   A.   Yes, they stood out from the criteria I was looking for.

6   Q.   And you did that using Google?

7   A.   Sir?

8   Q.   You did that using Google?

9   A.   Yes, I'm pretty sure I used that as a search engine.

10  Q.   And to the best of your recollection, Vermont Soap Company

11  was one of the first entries that came up, if you recall?

12  A.   I'm not sure of that.  At that time, in '10, there was a

13  lot of soap companies there, but they fit my criteria for the

14  hunting product.

15  Q.   And you would agree, would you not, that I think actually

16  you said, quote, anyone in the world could find Vermont Soap

17  Company by doing an internet search?

18  A.   A Vermont Soap company.  I mean, it might have been my

19  mistake to leave "a" out, but Vermont is known for their soaps,

20  handmade natural soaps.  They are actually called Vermont

21  Country Soap, Incorporated, not Vermont Soap Company.

22  Q.   But anyone in the world can find Vermont Soap Company by

23  doing a search on the internet?

24  A.   If they look.

25  Q.   That's how you found them?

KENNETH W. STEWART - CROSS

1   A.   Yes.

2   Q.   Now, you did not have any confidentiality agreements in

3   place with Vermont Soap before May of 2015; isn't that true?

4   A.   Well, I can't say that it's true because I thought we had

5   one.

6   Q.   But you haven't been able to locate them?

7   A.   No.

8   Q.   And so you aren't able to say that they existed?

9   A.   I couldn't say with a hundred percent accuracy.

10  Q.   It's true also that you would tell people who visited you

11  at trade shows that Vermont Soap was a supplier to Herd Guard?

12  A.   I would tell people who were product buyers at distributor

13  trade shows that they would inquire about the body shampoo,

14  hunters and pets, where it was made, because it's such a touchy

15  subject.  And I would say it's Vermont made natural soap.

16  Q.   You would tell them that Vermont Soap was your supplier,

17  would you not?

18  A.   No, I would never tell who my supplier is.  It's a sales

19  tool to say -- just like it's Kentucky bourbon.  It's very

20  simple to look at how it works.  You're talking about an area

21  known for its soap.

22  Q.   Mr. Stewart, at page 345 of your deposition, line 3,

23  beginning at line 3, the question was asked:  Who knew that

24  Vermont Soap was supplying Herd Guard?

25       Answer:  Oh, I guess nobody, really -- well, now, at shows

KENNETH W. STEWART - CROSS

1    sometimes, ladies would ask me, is your soap nice enough for a

2    woman?  And I would say, yeah, we have it made by Vermont Soap,

3    a ladies' soap company, you know, the public.

4         Question:  So in other words, you would tell a customer

5    potentially that Vermont Soap was making the product?

6         Answer:  That we had them make our product according to

7    our design specifications, scent free, it was a good sales

8    tool.

9         Do you recall giving those answers?

10   A.   A distributor buyer, not a user.  Because when they're

11   purchasing for a company they represent, they want to have a

12   better understanding of what a person's putting on their body.

13   So it wouldn't be the public.  If somebody called me on the

14   telephone and wanted to buy, it would be a potential account in

15   the distributor end of the business.

16   Q.   And you did not ask these potential accounts to sign

17   nondisclosure agreements?

18   A.   I didn't do public shows with the end user there.  I did

19   trade shows for distributors.

20   Q.   The distributors that you told this information to were

21   not asked to sign nondisclosure agreements with Herd Guard,

22   were they?

23   A.   Well, that just depends on who they were and what they

24   were doing.  If they weren't -- if there were a manufacturer or

25   somebody, you know, interested in the company or interested in

KENNETH W. STEWART - CROSS

```
 1    replicating, I would always have it signed, always, before I

 2    told them anything.

 3    Q.   My question relates to somebody coming up to you at a

 4    trade show, sir, that you said Vermont Soap was a supplier,

 5    just as you described in answering these questions.

 6         If you're answering those questions in that setting, you

 7    did not require the execution of a nondisclosure agreement, did

 8    you?

 9    A.   I think the question is a little bit spread out the way it

10    was asked.  I did not disclose my suppliers to anybody that was

11    a potential threat without a non-compete.

12    Q.   But you would disclose --

13    A.   I wouldn't use Vermont Soaps.

14    Q.   But you would disclose it to people you did not believe

15    were a threat without a nondisclosure agreement?

16    A.   I wouldn't disclose Vermont Soap Manufacturing Company.  I

17    would disclose Vermont Soaps, because they are known for being

18    gentle and natural and good for a lady.

19    Q.   Now, you have never met anyone from Vermont Soap in

20    person; isn't that true?

21    A.   Yeah.  Oh, no, not from Vermont Soap, you're right.

22    That's correct.

23    Q.   You started buying from Vermont Soap in 2010, I think you

24    said?

25    A.   Uh-huh.
```

KENNETH W. STEWART - CROSS

1   Q.   Is that a yes?

2   A.   Yes.

3   Q.   And you only have -- Herd Guard only has the one formula,

4   and that's used for all of its products, the hunting line, the

5   pet shampoo, laundry detergent?

6   A.   Additive, yes.

7   Q.   And no third-party manufacturer knows your formula; isn't

8   that true?

9   A.   No third-party manufacturer knows my formula?

10  Q.   Yes, sir.

11  A.   No.

12  Q.   They don't?

13  A.   They don't know the formula.

14  Q.   That's my question.

15  A.   There's what's in the formula and how to make a formula.

16  Q.   That's my question.

17  A.   You can have all the ingredients of something but not know

18  how much of each to put in to get to where you're doing your

19  objective.

20  Q.   That's correct.  And no one but you and the people at Herd

21  Guard know how to create Body Guard 360?

22  A.   Now, yeah.  There's a few because they did, NXT

23  Generation.

24  Q.   I'm not --

25       MR. VANCE:  Judge, can we approach for a second?  I

KENNETH W. STEWART - CROSS

1   apologize.

2          (Bench conference on the record.)

3          THE COURT:   Let the record reflect the parties are again

4   present at the bench outside the presence of the jury.

5          MR. VANCE:   Judge, I don't want to go down a rabbit hole

6   with Mr. Stewart here, but what he just said is not true.   The

7   evidence in the case is very clear, NXT Generation Pet does not

8   know and never has known how to make this product.

9          Mr. Stewart has, under questioning, conceded that point.

10  Given the answer that he just gave, I either need to find that

11  part of his deposition and read it back to him, or we need to

12  admonish the jury that what he just said is not accurate.

13         THE COURT:   Find his deposition and read it back to him.

14         MR. VANCE:   Okay.   It's going to take a minute.   Would

15  this be a time?

16         THE COURT:   No.

17         MR. VANCE:   Thank you, sir.

18         (Bench conference concluded.)

19         MR. VANCE:   Judge, I'm going to move on, I don't think

20  it's worth trying to find it --

21         THE COURT:   All right.

22         MR. VANCE:   -- at this point.

23  BY MR. VANCE:

24  Q.   The only products that Vermont Soap has ever manufactured

25  for Herd Guard is the shampoo that it filtered through

KENNETH W. STEWART - CROSS

1   diatomaceous earth, correct?

2   A.   Yes.

3   Q.   And the shampoo was a Vermont Soap product, it was not a

4   Herd Guard product.   In order to make it a Herd Guard product,

5   it had to be filtered through the diatomaceous earth that Herd

6   Guard sent to Vermont Soap?

7   A.   Yes.   They tried filtering to get the smell out of it

8   with -- that's what made it proprietary, is because I designed

9   a way for them to filter it to deliver it to me scent free.

10  The whole purpose was scent free.

11  Q.   If you have the formula ingredient list of Body Guard 360,

12  that does not tell you how to actually make Body Guard 360; you

13  still need the so-called recipe to be able to do it?

14  A.   Secret recipe.   In which I made it for -- for Riccardi

15  after he signed NADA at my shop.

16  Q.   Now, on May 20th, 2015, there were two nondisclosure

17  agreements signed, correct?

18  A.   Yes, sir.

19  Q.   I'm going to put before you, which I will mark as

20  Defendant's Exhibit 1.   Mr. Stewart, on the screen is the other

21  nondisclosure agreement.   Let me ask you if you recognize this

22  as one of the two nondisclosure agreements that was signed on

23  May 20th?

24  A.   Yes.

25  Q.   Now, you said earlier that the mutual nondisclosure

KENNETH W. STEWART - CROSS

1   agreement that was put in front of you by Mr. Regard came from

2   Herd Guard.  Is that your testimony today?

3   A.   Could you please state that question again?

4   Q.   Yes.  This is a copy of the mutual nondisclosure agreement

5   that Mr. Regard asked you about.  And I believe you told him

6   that this document came from Herd Guard.  Is that your

7   testimony today?

8   A.   We provided them with one and they provided us with one.

9   And it's confusing who signed one first.

10  Q.   All right.  I'll ask you very clearly then, the document

11  that is in front of you right now, the mutual nondisclosure

12  agreement, was that the document that Herd Guard prepared or

13  had prepared?

14  A.   Yes.

15  Q.   This document, then, would be the one -- Defendant's

16  Exhibit 1 would be the document that NXT Generation Pet

17  prepared or had prepared?

18  A.   Could you go to the next page, please, on through to the

19  non-circumvention part of it?

20  Q.   Let me hand you a copy.

21  A.   Okay, thank you.  Yeah, this is Herd Guard's.

22  Q.   All right.  So let me be very clear.  Are you saying that

23  this document, the one that's in front of you now, is the one

24  that Herd Guard prepared and asked to be signed?  This is

25  Defendant's Exhibit 1.  Let me just -- let me strike that and

KENNETH W. STEWART - CROSS

```
 1   start over, Mr. Stewart, because I'm not trying to confuse you
 2   here.
 3   A.    Right.   There was two.
 4   Q.    There were two.
 5   A.    And the one that was given to us by Riccardi signed had
 6   the circumvention clause in it.
 7   Q.    So that's your testimony today?
 8   A.    Yes.
 9   Q.    All right, sir.   Do you recall giving a deposition in this
10   case on July 2nd, 2018?
11   A.    Yes.
12   Q.    On page 133, beginning at line 7, the following appears:
13         Question:   In your mind, why do you believe that yours is
14   binding and his is not?
15         Answer:   Because mine goes on into circumvention, and the
16   fact that he couldn't work with my clients and do business
17   under it --
18         Question:   Well, look back at --
19         Answer:   -- or disclose anything.   It was a combination of
20   his and mine being better.
21         Do you recall that sequence of questions?
22   A.    Yes, I do.   And I was very confused at that point just
23   like you had me confused just now on it.   I didn't know which
24   one was prepared by us or him at that time, and was very
25   confused in the deposition on which one.   Because they really
```

KENNETH W. STEWART - CROSS

1   don't say, they both got both signatures on it.

2   Q.   Let me then ask you, on page 135 of the deposition,

3   beginning at line 4.

4        Question is:  Now, first of all, which of these was the

5   agreement he provided?  And which was the one you provided?

6        Answer:  The one that we provided has circumvention on it.

7   A.   I thought that was our agreement.  But our attorney,

8   Johnny Bolton, said that that one was okay -- they were both

9   good and that it would be fine signing them.

10  Q.   So are you now changing your testimony such that you now

11  say the one with the non-circumvention language is not your

12  document?

13  A.   The non-circumvention agreement was provided by them.

14  Q.   And you don't know which of the nondisclosure agreements

15  was signed first; isn't that true?

16  A.   There was some things -- after discussing it with my

17  daughter, who wasn't in -- anywhere around when these questions

18  were asked, then I realized that the one with the circumvention

19  agreement was theirs.  It covered a broader range.  And my

20  thoughts was it don't matter, they are both signed.

21  Q.   Let me go back to Exhibit 1, which is the packet that

22  Mr. Regard asked you about.  You don't have any document that

23  shows that that was provided to NXT Generation Pet.  There's no

24  email that attaches it, nothing of that type, is there?

25  A.   I can't answer that.  I'm not very good with email and

46

KENNETH W. STEWART - CROSS

1    computers and my daughter handled all of that.

2    Q.    Is the pet shampoo the same thing as a product called pet

3    wash?  What's the pet wash?

4    A.    I'm not familiar with what pet wash is.

5    Q.    All right.

6    A.    Is that a Vermont product or --

7    Q.    With respect to Body Guard 360, as you said earlier, if

8    water is added and diatomaceous earth are added, it cannot be

9    certified as organic; isn't that true?

10   A.    If the raw product has water added, it definitely can't be

11   certified because water can't be certified.

12   Q.    And Herd Guard never disclosed the formula for Body Guard

13   360 to NXT Generation Pet; isn't that true?

14   A.    Riccardi come in my shop and we made it.

15   Q.    Herd Guard never disclosed the formula to him, though?

16   A.    We made it, after the NADs were signed, together.  Saw the

17   process.  That's still my secret sauce though, because the

18   quantities were already weighed out.

19   Q.    So in your deposition again, on page 165, line 24, it

20   begins:

21        Question:  Okay.  Well, did you ever disclose any formula

22   to NXT?

23        Answer:  What was in it?

24        Question:  Did you ever disclose any formula to NXT?

25        Answer:  I don't know what you mean by "disclose."  Giving

47
KENNETH W. STEWART - REDIRECT

1  them the product?

2       Question:  Telling them what it was or showing them.

3       Answer:  No.

4       Question:  Giving them, sending --

5       Answer:  No.

6       Question:  -- it to them in writing?

7       Answer:  No.

8       Question:  Or anything like that?

9       Answer:  That's like cutting off your nose to spite your

10  face in a negotiation like that.  Tell them what you've got.

11  There was no reason to.  They weren't inquiring what it was.

12  They were inquiring how many different things it can work on

13  besides this.

14  A.   This was before the NDA.

15  Q.   Herd Guard has been dissolved and it no longer is in

16  existence; isn't that true?  Is that yes?

17  A.   In dissolution.  The product name or the corporation?  I'm

18  confused on what you're talking about.

19       MR. VANCE:  I think that's all I have.  Thank you, Your

20  Honor.

21       THE COURT:  Mr. Regard.

22                     REDIRECT EXAMINATION

23  BY MR. REGARD:

24  Q.   Mr. Stewart, just so the jury is clear, because you've

25  talked about formula and recipe, can you differentiate that for

KENNETH W. STEWART - REDIRECT

1    the jury and explain what you mean by formula versus recipe

2    based on the questions that Mr. Vance was asking you?

3    A.    Formula is just the different products that come together

4    to make something.  The recipe is how it's -- there's three

5    steps.  One step would be how do you put it together and the

6    quantities that you put it together in.

7         The next step would be what the usage is, what you're

8    wanting to do with it.  Are you putting it in just as an

9    infusion into a shampoo or a soap?

10        And then the third would be is how you deliver it.  For

11   instance, a sprayer has a certain orifice that a fluid has to

12   flow through.  And there's certain things that you do in your

13   recipe and formula to make it flow through so it sprays

14   properly.  So the sizing of the equipment that has to deliver

15   it, that's secret.

16        I mean, there's a multitude of secrets involved, you know,

17   in that, and how its end use is and how it's delivered.

18   Q.   So if one knows the ingredients, can they necessarily make

19   the product?

20   A.    No.  That's the secret of all of it.  You know, just like

21   Coca-Cola and different companies.  Everybody knows they put

22   syrup and everybody they know put cocoa, and everybody knows

23   they have coconut oil and different things in it.  But you

24   can't make it because you don't know the quantities to get the

25   flavor that's so well-known to all the public.  That's the

1   secret.

2        MR. REGARD:  I don't have any further questions, Your

3   Honor.

4        THE COURT:  Recross, Mr. Vance?

5        MR. VANCE:  No, Your Honor.

6        THE COURT:  Thank you, Mr. Stewart.  You may stand aside.

7        Ladies and gentlemen, during your afternoon recess,

8   remember the admonition of the Court.  Do not discuss the case

9   among yourselves, allow anybody to discuss it with you.  Don't

10  talk about it amongst yourselves.  We'll see you back in here

11  at 10 until 2.

12       Court will be in recess.

13       (A recess was taken from 1:37 to 1:53 p.m.)

14       (Excerpt concluded.)

15

16                   C E R T I F I C A T E

17        I, Linda S. Mullen, RDR, CRR, do hereby certify that

18  the foregoing is a correct excerpted transcript from the record

19  of proceedings in this above-entitled matter.

20
    /s/Linda S. Mullen              August 23, 2019
21  Linda S. Mullen, RDR, CRR       Date of Certification
    Official Court Reporter
22

23

24

25