```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION AT LEXINGTON

 3                              - - -
     HERDGUARD, LLC,                  .  Case No. 5:16-CV-00468
 4                                    .
              Plaintiff,              .
 5                                    .  Lexington, Kentucky
           - v -                      .
 6                                    .  Wednesday, March 27, 2019
     NXT GENERATION PET, INC.,        .
 7                                    .  Day 2 of 2
              Defendant.              .
 8                              - - -

 9              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE JOSEPH M. HOOD
10             UNITED STATES DISTRICT COURT JUDGE

11                              - - -

12

13   For the Plaintiff:        ANDRE F. REGARD, ESQ.
                               Regard Law Group, PLLC
14                             234 North Limestone
                               Lexington, Kentucky  40507
15
     For the Defendant:        PALMER G. VANCE, II, ESQ.
16                             Stoll, Keenon Ogden, PLLC
                               300 West Vine Street, Suite 2100
17                             Lexington, Kentucky  40507

18   Court Reporter:           LINDA S. MULLEN, RDR, CRR
                               Official Court Reporter
19                             101 Barr Street
                               Lexington, Kentucky  40507
20

21   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
22

23

24

25
```

 1          (Proceedings in open court, March 27, 2019, 11:13 a.m.)

 2          THE COURT:  Good morning.

 3          ALL:  Good morning, Your Honor.

 4          THE COURT:  Is there anything we need to take up before

 5   the jury comes in?

 6          MR. REGARD:  Yes, sir.  I think there were a few things we

 7   wanted to take up.

 8          THE COURT:  Okay.

 9          MR. REGARD:  We have already called Ms. Sommers up as a

10   witness.  We would like to know if we could have leave of the

11   Court to call her back up as the representative of -- the

12   corporate representative of NXT rather than as a fact witness.

13          MR. VANCE:  Judge, we've already heard from Ms. Sommers.

14   If he wants to -- he can certainly cross-examine her, but I

15   don't know why he would be able to call her back as a witness

16   at this point.

17          We certainly -- we understand he's going to try to call

18   Mr. Stewart back as well, which we object to.  At some point,

19   you put on your case and you can't just keep saying, well,

20   there's been more evidence so I need to put somebody back on

21   the stand.  There's been more evidence, need to put that person

22   back on the stand a third time and a fourth time.  Where does

23   it stop?

24          So certainly, with respect to Ms. Sommers, we object.  He

25   had his opportunity and said that he was finished.

1      THE COURT:  I agree.

2      MR. REGARD:  Okay.

3      Your Honor, the other question was, on the damages issue,

4  one of the causes of damages is attorney fees.  And in doing

5  research, I realize that it's normally the Court that would

6  make that final decision, so I wanted to know if, during the

7  closing, we should talk about attorney's fee damages or is that

8  going to be for the Court to make that decision?

9      THE COURT:  That's my decision.

10      MR. REGARD:  Very well.  Those were my only two issues,

11  Your Honor.  Thank you.

12      THE COURT:  Mr. Vance.

13      MR. VANCE:  Judge, in the interest of time, we only have

14  three minor -- I don't know if they are minor -- three

15  objections to Mr. Plesent's deposition, it might be as

16  sufficient to take those up now rather than stop in the reading

17  of the deposition.

18      THE COURT:  Okay.  Go ahead.

19      MR. VANCE:  Two of them, the first two, relate to the same

20  topic.  And these are the designations, for the record, on

21  page 54, lines 9 through 12, and on page 55, line 19, through

22  page 56, line 24.  These relate to experiments that Vermont

23  Soap was conducting on its own volition for NXT Generation Pet,

24  or at least it wanted to try to market this to NXT Generation

25  Pet.

1          And we believe that's completely irrelevant to the issues

2    before the Court.  This was all taking place in the fall of

3    2015, long after the issues related to when NXT Generation Pet

4    knew about Vermont Soap.  And again, it relates to the issues

5    related to Herd Guard's formula and such.

6          With respect to the designation that begins on page 55,

7    there isn't even a question.  They just have designated to

8    start reading at line 19, which is in the middle of

9    Mr. Plesent's answer.  So we object to the designations on

10   page 54, lines 9 to 12; page 55, beginning at line 19 through

11   page 56, line 24, because it is irrelevant and the latter

12   designation does not have a question that sets it up.

13         MR. REGARD:  Your Honor, I think there's been a lot of

14   discussion about the relationship between NXT and Vermont Soap.

15   There's been a lot of discussion about diatomaceous earth and

16   the experiments.  And I think, for context for the jury, that

17   this testimony does provide more some context for the --

18         THE COURT:  Well, it might produce more context, but the

19   real question is, does this in any way show that NXT Gen had

20   knowledge of -- the real issue before us, did NXT Gen have

21   knowledge of Vermont Soap before it got involved with Herd

22   Guard?

23         MR. REGARD:  And in all candor to the Court, it does not

24   discuss that, Your Honor.

25         THE COURT:  Okay.  So -- okay.

1          MR. VANCE:  The last one, Judge, is a question and answer

2     on page 58.  And it is -- has to do with the fact that NXT

3     Generation stopped doing business with Vermont Soap at some

4     point and Mr. Plesent is asked if he knows why.  That's really

5     irrelevant to the issues before the Court.

6          THE COURT:  Come at me again with that.

7          MR. VANCE:  Sure.  The question, Judge -- this is page 58,

8     lines 2 through 9.  And it's one question, one answer.

9          Did anybody from NXT Generation call you or anybody else

10    at Vermont Soap, to the best of your knowledge, to explain why

11    they had terminated the relationship of buying product with

12    Vermont Soap?

13         And Mr. Plesent says:  No.  Nichole and I had talked to

14    each other about it and we had some assumptions.

15         I'm practicing reading slower.

16         We basically assumed that they were resting until they got

17    this resolved, but we didn't know.  No, we didn't know why.

18         So it's about the termination of the relationship which

19    didn't happen until late 2017, more than two and a half years

20    after the incident we're focused on today.

21         THE COURT:  He's asking -- he asked about Herd Guard's

22    relationship with Vermont Soap?

23         MR. VANCE:  No, he's being asked about --

24         THE COURT:  What page is that again?

25         MR. VANCE:  Page 58.

1     MR. REGARD:  Or page 7 of 7 on the bottom, Your Honor.

2     MR. VANCE:  Page 58, lines 2 through 9, Judge.  It's about

3  the termination or ending of the relationship between NXT

4  Generation Pet and Vermont Soap.  Had nothing to do with Herd

5  Guard.

6     THE COURT:  I'm having trouble finding where we're talking

7  about.  Counsel approach, quickly.  Off the record.

8     (Bench conference off the record.)

9     THE COURT:  All right.  Anything else?

10     MR. VANCE:  No, Your Honor, not for the defendant.

11     THE COURT:  Okay.  Let's show the jury in, please.

12     (Jury entered courtroom at 11:21 a.m.)

13     THE COURT:  Good morning.

14     ALL:  Good morning.

15     THE COURT:  Let the record reflect that the jury is

16  present in the courtroom.  We'll waive the poll of the jury.

17     MR. VANCE:  Yes, Your Honor.

18     THE COURT:  Please be seated.

19     Next witness, Mr. Regard.

20     MR. REGARD:  Your Honor, Herd Guard would call Larry

21  Plesent via deposition.

22     THE COURT:  You may ask.

23                    LARRY PLESENT

24     (Deposition read into the record.)

25  BY MR. REGARD:

1   Q.   Please state your name for the record.

2   A.   Larry Ronald Plesent.

3   Q.   Are you the founder of Vermont Soap?

4   A.   I am, sir.

5   Q.   And Nichole earlier referred to you as one of the

6   formulators; is that correct, that you are one of the

7   individuals who would make formulas for Vermont Soap?

8   A.   I am the primary formulator.

9   Q.   Thank you.  Before working with Herd Guard LLC, did

10  Vermont Soap use diatomaceous earth in any of its products?

11  A.   No, and nor do we now.

12  Q.   Were you at Vermont Soap on or about July the 8th when

13  Beth Sommers and Jason Riccardi and the third individual from

14  NXT came for a visit at your facility?

15  A.   Yes, sir.

16  Q.   During that visit on July 8th, did you have any

17  discussions with Beth Sommers about Herd Guard?

18  A.   Generally, yes.  It is extremely likely.

19  Q.   Did you have a conversation with Mr. Riccardi where you

20  explained to him the filteration process that was used for the

21  Herd Guard product?

22  A.   Excuse me, Mr. Regard.

23  Q.   Yes?

24  A.   We work with over a hundred clients, and our main business

25  is taking people's secret ingredients, whether it's a scent or

1    some other thing, and adding it to our base.  That's what we

2    do.  We do not discuss the secret proprietary information that

3    we are given.  So there is zero chance that I would have

4    discussed any proprietary information regarding what we did for

5    any other client.

6    Q.   Okay.  Given the fact that one of the purposes of the

7    visit of Jason and Beth, as representatives of NXT Generation,

8    was part of their due diligence related to their acquisition of

9    Herd Guard, did you discuss with either of them or anybody else

10   from NXT Generation the filteration process that Vermont Soap

11   did for NXT Generation?

12   A.   No, sir.

13   Q.   Did you discuss with anybody from NXT Generation that

14   Vermont Soap -- that Herd Guard used diatomaceous earth as an

15   ingredient in their product?

16   A.   No, sir.  That would be a break -- that would be breaking

17   our nondisclosure agreement with Herd Guard.  We would not

18   discuss what we did.

19   Q.   Did any representatives of Herd Guard tell you prior to

20   July 8th that they also had an NDA with NXT Generation?

21   A.   Sir, I was told there was an NDA.  I cannot recall the

22   exact date or which visit that was on, whether it was the first

23   one or the second one.  They were a few weeks apart.  But

24   certainly by the second meeting, it was clear that they had a

25   NDA.  That was stated.

1    Q.   When you say it was clear by the second meeting, on what

2    basis do you say that as you sit here now?

3    A.   Mr. Riccardi at one point said, and I basically quote, I

4    have not one but two nondisclosure agreements with Herd Guard.

5    Q.   Okay.  So as of October the 1st, at least, 2015, when

6    these emails were going back and forth, it was still your

7    understanding that NXT Generation Pet was still in

8    correspondence with Herd Guard about a potential acquisition?

9    A.   Oh, I have a strong -- I had a strong personal interest in

10   seeing that this deal was consummated.  As I said, I had tied

11   up an ingredient with this guy.  I wasn't sure whether it was

12   clear that I could use it somewhere else.

13        Typically, I'll have to say "typically," sir, when people

14   have an ingredient, they will either say, please don't make

15   this product with this ingredient in soap, and we'll say, okay,

16   you got -- it's typically clearer what's going on.

17        Now, all we knew he was -- all we knew was he was using DE

18   in soap.  We had no reason to believe that DE in any other

19   product would not be allowed.  But I erred on the side of

20   caution and I did not bring any products to market as long as

21   we were working with Herd Guard.  I had high hopes that Ken was

22   going to break out, get that big account, those big accounts he

23   was talking about, and we would have two contracts.  One to

24   make the base and one to fill it.  That's very lucrative.

25   Q.   So you knew before June of 2015 that DE was a product

1   being used by Herd Guard?

2   A.   Yes.  We were putting it in the filters.

3   Q.   But you had not had conversation -- maybe I'm unclear.  I

4   thought you said -- I thought you said the first conversation

5   you had with Ken was in June of 2015.

6   A.   Absolutely.

7   Q.   When did any representative of NXT Generation Pet tell you

8   that they were no longer pursuing the deal with Herd Guard?

9   A.   Oh, that's a very good question.  It would be hard for me

10  to reference directly.  I'm hoping there's something in these

11  records that would get us more accurately, but certainly if I

12  reference Exhibit 16, is this appropriate?

13      MR. REGARD:  Your Honor, I've put Exhibit 16 on the screen

14  and we would move that we be allowed to admit it.

15      THE COURT:  Objection?

16      MR. VANCE:  16 in your notebook, Mr. Regard?

17      MR. REGARD:  It is 16 in my notebook, yes.

18      MR. VANCE:  Judge, if we could approach on this one?

19      THE COURT:  Approach, please.

20      (Bench conference on the record.)

21      THE COURT:  Let the record reflect the parties are present

22  at the bench outside the presence and hearing of the jury.

23      Yes, sir, Mr. Vance.

24      MR. VANCE:  Judge, we do object to submitting this

25  consistent with objections we made yesterday about the terms of

1  the asset purchase agreement, terms of any purchases and so on

2  and so forth.  That's totally irrelevant.

3      This is taking place in October, I believe.  I don't have

4  it in front of me, I believe the date is October of 2015, which

5  is long after the events that are at issue before the jury as

6  to the nondisclosure agreements.  And so I would object to

7  putting this exhibit in front of the jury because I think it

8  will only confuse them as to what's relevant.

9      THE COURT:  Mr. Regard.

10     MR. REGARD:  I believe the exhibit specifically discusses

11  the nondisclosure agreement, and it's a discussion between

12  Mr. Plesent and Mr. Riccardi about that nondisclosure

13  agreement.  I think that's relevant, Your Honor, to the idea

14  that the parties believed that the nondisclosure agreement was

15  a valid agreement, was an important agreement, was there to

16  protect information and to protect the parties.

17     MR. VANCE:  There's no dispute that the nondisclosure

18  agreements were signed.

19     THE COURT:  Yeah.  My problem I see with this, with this

20  exhibit, is not the first paragraph.  It's paragraphs 2, 3 -- 2

21  and 3.  I mean, I think we all agree and I so instructed the

22  jury that there were nondisclosure and -- what's the other one?

23     MR. VANCE:  There's a mutual nondisclosure agreement and

24  the one that's headed Herd Guard nondisclosure agreement.

25     THE COURT:  Yeah, but there's one about -- not the

1    nondisclosure agreement, the other one.

2        MR. REGARD:  Non-circumvention.

3        THE COURT:  Non-circumvention.  Yeah, I told the jury

4    that, that there were these.  So really this doesn't add much

5    to their knowledge.  I told them that.

6        But I will allow it to come in, but we will not show

7    paragraphs -- the second and third paragraphs of this exhibit.

8        MR. REGARD:  Thank you, Your Honor.  I don't have a

9    marker.  I'm worried about the exhibit book when it goes back.

10   I don't need a marker.

11       MR. VANCE:  Okay.

12       MR. REGARD:  I can change it on the screen.

13       THE COURT:  Okay.

14       MR. VANCE:  Thank you, Judge.

15       (Bench conference concluded.)

16       THE COURT:  You probably wonder why we have these bench

17   conferences.  Because we don't want you to hear what we're

18   talking about.  Pure and simple.  We were just talking law

19   business, and that's not necessarily something that you need to

20   do.

21       MR. REGARD:  Your Honor, I think I've highlighted the

22   portion that we discussed.

23       THE COURT:  All right.

24       MR. REGARD:  May we present this to the jury?

25       THE COURT:  Yes, you may.

1       MR. REGARD:  We're on line 22.

2  Q.   Yes.

3  A.   So here in Exhibit 16, I have a very interesting letter

4  here.  It's from me, it's dated 3/31, towards the end of the

5  day on October 9th, a Friday, to Jason Riccardi.  Subject:  I

6  spoke with Ken.  Can I read this out loud, or some of it?  It

7  would help me.

8  Q.   Sure.

9  A.    Hi, Jason.  Not to get in the middle of your business, but

10  I was speaking with Ken from Herd Guard today.  He stated that

11  his lawyer told him that on the nondisclosure agreement between

12  you, between -- "you" meaning you two, precludes your, quote,

13  even buying a bar of soap from this guy, meaning us.

14       He told me that the only reason he allowed you to access

15  his vendor list is because of this agreement, at which point I

16  was getting a little panicky.  And I said to him, Jason, I am

17  hearing a potential lawsuit in the wings naming both of us,

18  okay?  I want this deal to go through, I've waited eight years

19  to use DE, and the guy bought $8,000 worth of stuff.  I got a

20  factory to run, I want this to work.

21       So I asked him if there was a way we could make this work.

22  Here are the three options he gave us, best as I can ascertain

23  them from the notes of my conversation.

24       One, give him $350,000, you own everything.  No residuals.

25  Period.

1       Two, give him $300,000, you own everything but he can keep

2   selling the pet shampoo under his brand without the powder

3   added, and no residual.

4       Or 200, you own everything, but he gets a negotiated

5   residual.

6       I hope this is constructive, looking forward to our

7   Thursday meeting.  All the best.

8   Q.   So what did Jason say to you after you sent this email?

9   A.   I have no idea.  He didn't reply, that I'm aware of.  I

10  don't have anything in here that says that he replied.  I think

11  he just left it.

12  Q.   At some point, did either Jason or Beth or any other

13  representative of NXT Generation tell you, we are no longer

14  pursuing a potential acquisition of Herd Guard or Herd Guard's

15  products?

16  A.   Yes.  There was a point where they said that, absolutely.

17  Q.   When?

18  A.   Do we have records of the next meeting in October?  So

19  this was the 9th, which was a Friday.  So it would have been

20  six days later, so that would have made it the 15th.  That

21  would be the Thursday meeting referred to.  That would have

22  been when they walked in the door and I looked at them and I

23  held up my hand and I said, so you cut a deal with Ken?  And he

24  goes, no, there's no deal with Ken.  And I was, whoa,

25  devastated, so that's when I heard it.

1        MR. REGARD:  Turn to volume II, please.

2        THE WITNESS:  Yes.

3   Q.   Is everything that Vermont Soap sells organic?

4   A.   No.  Most of what we sell is or has to be completely

5   natural or we don't mess around with it.

6        Now, to clarify that, okay, our natural products many

7   times, but not always, for marketing reasons, the client

8   chooses not to do organic certification.  However, they may use

9   the same bases using organic materials, but they would list it

10  on the ingredients.  They would say organic coconut oil,

11  organic this, organic that.

12       We also have a client, for example, one of our biggest

13  clients for many, many years, and they have a proprietary thing

14  that we put into our soap.  The base of the soap is certified

15  organic.  They are a more mass market product, so they have

16  made the decision that they don't want to claim organic on

17  their label anywhere, less they -- somebody who listened to CNN

18  and says organic is the same as everything else, but you're

19  being charged more, if they happen to believe that they might

20  be turned off by the product.

21       Other times, everything that -- may be organic, but they

22  want a color in it.  They would like it to be colored.  So even

23  though we use the safest possible colors, adding that color is

24  not going to go with organic.

25  Q.   But the process of getting an organic certification would

1  be the customer asking you to do that; is that correct?

2  A.   Yes.

3  Q.   You're not just going to do an organic certification

4  without the customer request?

5  A.   Never.  They have to pay for it.  You're ordering the

6  pizza, they are paying for it.  You don't want to throw

7  broccoli when they don't want it.

8  Q.   Have you see this report, which we've marked as

9  Exhibit 17, before today?

10  A.   This one we're looking at?

11  Q.   Yes.

12  A.   No, I'm not familiar with this.

13       MR. REGARD:  Your Honor, we would move to admit

14  Exhibit 17.

15       THE COURT:  Objection?

16       MR. VANCE:  No objection, Judge.

17       THE COURT:  Let it be filed.

18            (Plaintiff Exhibit 17 was admitted.)

19  BY MR. REGARD:

20  Q.   If you look at the second-to-last page, it has a total

21  sales amount?

22  A.   Okay.

23  Q.   That reflects $144,754.91.  Give or take a brick,

24  $150,000.  Do you believe that that accurately reflects the

25  sales volume that you had with NXT Generation or do you have

```
 1   any reason to believe that it would have been more?
 2   A.   This is perfectly reasonable.   This is what I would say,
 3   it's obviously all accounted for, every penny.
 4   Q.   All right.   So I realize you haven't seen this document.
 5   A.   It looks entirely accurate and meets my understanding of
 6   what we did with them based on my conversations with Heaster.
 7   I believe my initial estimate to her was, I think we did about
 8   120 to 150, and she came back -- and I didn't see this -- she
 9   said you did about 144.   Okay.
10   Q.   So you have no reason to dispute that number as being
11   wildly wrong or off?
12   A.   No.   I'm sure that this is -- our bookkeeper is a very
13   accurate woman.
14        MR. REGARD:   I have no further questions, Your Honor.
15        THE COURT:   Mr. Vance.
16        MR. VANCE:   I'm going to start on page 7, line 23.   I've
17   been scolded by the court reporter, I'm going to try to read
18   slower today.
19        THE COURT:   Scolded?
20        MR. VANCE:   Scolded.
21        THE COURT:   The Lovely Linda would scold you?
22        MR. VANCE:   With the very best of intentions, Judge.
23        THE COURT:   I'm sure.
24                      CROSS-EXAMINATION
25   BY MR. VANCE:
```

1   Q.   Okay.  Did you have any specific discussions that you

2   recall with Beth Sommers about Herd Guard during her July 8th

3   visit?

4   A.   Not that I recall, no.

5   Q.   Was it your understanding that Beth was coming to visit to

6   discuss their potential acquisition of Herd Guard?

7   A.   No.  It was my understanding that they were coming to

8   discuss a line of pet products, and that they were also

9   concurrently in negotiations with one of our clients, Herd

10  Guard.

11  Q.   Do you recall any specific discussions that you had with

12  Jason Riccardi during the visit on July the 8th, 2015, as it

13  related to Herd Guard?

14  A.   I don't recall specific -- specifically.

15       MR. VANCE:  Page 12.

16  Q.   So if you look at Exhibit 3.

17  A.   Yes.

18  Q.   And you turn to the third and fourth page, which is the

19  formula and the MSDS.  It would have been your understanding

20  that this document, which has formula ingredients, would have

21  been the kind of information that is normally kept safely as

22  confidential client communication?

23  A.   Sir, this is a very interesting junction here.  So here we

24  have a document that was sent to us on June 26th of 2015, in

25  which they gave us the exact formula, which was completely

1    unnecessary to do.  They didn't need to reveal that.  And they

2    also gave us the exact percentages of their pet spray with the

3    ingredients, which they did not need to do.

4         And one might logically conclude, by looking at the

5    material data safety sheet, which is a public document, okay,

6    it's a public document, that it was safe to discuss this.

7    However, we chose not to.

8         So at no point did we discuss this information, even

9    though the creation of a material data safety sheet would seem

10   to indicate that it was now public information.

11   Q.   As you sit here today, do you know, in fact, as of

12   June 26th, 2015, the MSD sheet that was attached to the email

13   from June 26th, 2015, had been made public?

14   A.   I have no idea and so we considered it to be proprietary.

15   Q.   Just as you do with many of your clients?

16   A.   With all of our clients, sir.

17   Q.   Now, you said a moment ago it wasn't necessary to give you

18   the formula?

19   A.   No.

20   Q.   Why did you say that?

21   A.   A material data safety sheet does not need to write down

22   the percentages of the ingredients.  It's there to identify the

23   material data safety sheet exists.  Exactly as it says, it's a

24   safety data sheet.  So if somebody were to accidentally ingest,

25   touch, breathe in, they would have to have -- it would indicate

1    the proper warnings associated to keep it safe.

2        So in order for a material to be in our factory, there's a

3    book by the door, big book of everything that's in that door,

4    so if somebody gets hurt, we know what it is, whether we need

5    to take them to the hospital or sit them down and give them a

6    glass of water.

7    Q.   Was it your understanding when the formula in the material

8    data -- the material data safety sheet was provided, that Herd

9    Guard was trying to determine whether or not their product

10   could be certified organic?

11   A.   Oh, yes.  I had a specific conversation with Mr. Stewart

12   about this.

13   Q.   When you had that specific conversation, did you tell him

14   you would need to know the formula in order to make that

15   determination?

16   A.   I said we need to know what the ingredients are.  We don't

17   need to know what the percentage is.

18   Q.   Isn't it true, that depending on what percentage an

19   ingredient is in a formula, or could -- could or could not make

20   that formula organic?

21   A.   I understand what you're saying.  Is it appropriate for me

22   to explain the organic program in very general terms to help

23   answer that question?

24   Q.   Yes, if you can answer the question.  Because from

25   Nichole's deposition, she talked about thresholds, one of them

1   being 95 percent.  The other being 70 or 75 percent.

2   A.   70 percent, yes.  And water does not count in the formula

3   regardless of what Mr. Stewart seemed to believe.  So along

4   with -- so along with the thresholds -- along with the

5   thresholds, okay, there is a very small list that's called the

6   allowable synthetics, okay?  Now, these are very limited, very

7   small group of non-organically certified ingredients that may

8   still be used in a certified organic formula, okay?

9        In that specific instance, where allowable synthetic is

10  there, the percentages would indeed be germane, okay?

11  Q.   Thank you.  I appreciate that.

12       At some point did you tell Mr. Stewart that Body Guard 360

13  could not be certified organic?

14  A.   Absolutely.  That was our first time I spoke with him.  I

15  can elaborate on my memory of that, of that discussion, if you

16  would like.

17  Q.   I would like for you to, but let's just try to get a time

18  frame.  I believe that Nichole said you, Vermont Soap, may have

19  done business as far back as 2010 with Ken Stewart and/or Herd

20  Guard.  Different variations.

21       So going back to 2010, if you could tell me your

22  recollection of the first time you told him that his product

23  could not be certified as organic, I would appreciate it.

24  A.   Absolutely.  To the best of my recollection, the first

25  time I spoke with Ken Stewart was in the -- at the end of June,

1    okay?

2    Q.   Of 2015?

3    A.   2015.  I did not speak with him the first, was it five

4    years that we did business with him.  He was a very small

5    client.  He never paid his bills on time.  He didn't do what he

6    said he was going to do.  We considered him, you know, not our

7    best client, not the easiest one to work with, but we

8    accommodated him.

9         So we had tied up DE, diatomaceous earth, and soap for

10   him.  We couldn't use it, we weren't using it for anybody else.

11   And out of respect for him, I just stopped even thinking about

12   it.  I wasn't formulating it.  He's got it tied up as long as

13   he's in business, okay?

14        So after this document was sent to Nichole, the Herd Guard

15   formula that we're referring to, and she told him that it could

16   not be certified organic, he got rather agitated and Nichole

17   had me talk to him, okay?

18        He was kind of spitting mad about the whole thing, comes

19   from the earth, da, da.  Yes, but it's an organic program, it's

20   a little different.  We were kind of making -- I told him,

21   we're making organic food for your skin and we are certified to

22   organic food standards.  There is not a special cosmetic

23   standard.  He didn't seem to want to accept that, and I said,

24   well, our operations manager will be happy to give you a second

25   opinion.  She's very schooled at the organic rules, as I am,

1    and I promised him I would run it by him.

2         Later that day, we talked again and we reaffirmed, we all

3    agreed, this is absolutely not certifiable.  We discussed the

4    ability to get organic charcoal, which we knew is theoretically

5    possible, I don't know if it was available at the time.  The

6    other ingredients, I can't help him.

7    Q.   All right.  Moving to page 68.

8         Did Vermont Soap ever communicate the formula for Body

9    Guard 360 to anyone from NXT Generation Pet?

10   A.   Absolutely not.

11   Q.   Has Vermont Soap ever manufactured Body Guard 360 for Herd

12   Guard?

13   A.   Sir, our sole dealings with Herd Guard were to put DE --

14   either filter the soap through DE or put DE into the soap and

15   filter it out.  Or in the final orders, to put DE into the soap

16   and let Mr. Stewart do whatever he is doing with it.

17   Q.   Yes, I understand that.  So my question may seem very

18   obvious to you, but I am trying to get it on the record.

19   A.   Absolutely.

20   Q.   Has Vermont Soap ever manufactured for Herd Guard Body

21   Guard 360?

22   A.   Sir, I'm not sure I know what Body Guard 360 is.  It's a

23   product Herd Guard makes, I don't want to misspeak.  If Body

24   Guard 360 is a reference to liquid soap filtered through or

25   with added DE, then I would answer one way.

1      If Body Guard 360 is anything but that, the answer is no.

2   I don't know what Body Guard 360 means, sir.  It's something

3   that a client made.

4   Q.   I'm not trying to be confusing here, Mr. Plesent, I'm

5   really not.

6   A.   Okay.  If you explain what Body Guard 360 is, then I can

7   tell you.  But if it's anything but DE and our liquid soap

8   base, the answer is quite clearly no.

9   Q.   All right.  Now, let me see if we can get that clearly.   I

10  don't have a clue what Body Guard 360 is.  The plaintiff --

11  A.   That's two of us.

12  Q.   The plaintiff in this case has alleged that Vermont Soap

13  has, in some manner, manufactured Body Guard 360.

14      My question simply to you is, is that true?

15  A.   I have no idea, because I don't know what Body Guard 360

16  is.  I can't comment.  I can make an assumption, but I don't

17  know if that is relevant here.  I can assume that because

18  Mr. Stewart had, from his material data safety sheet, indicated

19  two other ingredients that were used in his formula, since we

20  were only familiar with diatomaceous earth and liquid soap,

21  that the answer would have to be no, because I never did

22  anything with those other two ingredients and diatomaceous

23  earth and a liquid soap for anyone.

24  Q.   Let me try it this way.  Have you ever seen Herd Guard's

25  finished product in packaging?

1  A.    I have seen it on the internet and that's after

2  deposition.

3  Q.    Has Vermont Soap ever manufactured the finished product?

4  A.    Absolutely not.

5  Q.    Now, Vermont Soap is a business that's open to the public,

6  correct?

7  A.    Define that statement, please.

8  Q.    In other words, you do business with customers?

9  A.    All around the world.

10  Q.    You do business with any client who approaches you who has

11  the funds to do business with you and wants you to provide a

12  private label product, isn't that true?

13  A.    That is absolutely true.  We are well represented.

14  Q.    I'm sorry, go ahead.

15  A.    I was going to say, we are well represented on the

16  internet.  We spend a lot of money promoting our product -- our

17  products and services on the worldwide web, both as a brand, as

18  a source of the bulk materials, as a private-label formulator

19  and occasionally doing custom work.

20        So we are -- if you type in organic pet products, organic

21  soap, organic topical products, anything even remotely near

22  there, we are right there.  We are right there on the page.  We

23  are easy to find.  We were very early on the worldwide web.  As

24  someone said, Google loves Vermont Soap.  We are always on the

25  front page.

1   Q.   And it's true that Vermont Soap actively seeks business

2   from new clients?

3   A.   Absolutely.  We do trade shows.  We are in the business of

4   seeking new clients and executing their orders.

5   Q.   Are you aware of how Herd Guard originally learned of

6   Vermont Soap?

7   A.   No, I am not.  That would have been during the initial

8   five-year period when I didn't speak with Herd Guard.

9        MR. VANCE:  Those are the all questions, Judge.  We do

10  move to admit Exhibit 3 to Mr. Plesent's deposition, which we

11  will mark as Defendant's 6 and provide to the clerk.  We did

12  not need to show that to the jury at this point.

13       THE COURT:  All right.  Any objection?

14       MR. REGARD:  I'm not sure which exhibit he's talking

15  about, Your Honor.  I don't have a copy of it.

16       MR. VANCE:  We can provide that.

17       THE COURT:  Any cross -- or redirect?

18       MR. REGARD:  Your Honor, may I approach?

19       THE COURT:  Please.

20       (Bench conference on the record.)

21       THE COURT:  Hi.

22       MR. REGARD:  My first time.

23       THE COURT:  I know.  Here comes Mr. Vance.  Is it hard to

24  walk through that trough that you have worn in the carpet?

25       MR. VANCE:  It's getting harder.

1        THE COURT:  I figured.

2        Let the record reflect the parties are present at the

3    bench outside the presence and hearing of the jury.

4        MR. REGARD:  Mr. Vance asked that we not be able to bring

5    up two parts of the deposition that we have designated because

6    it talked about things that had happened afterwards.

7        However, we were at a significant part of the deposition

8    about not doing anything with diatomaceous earth and not doing

9    any of the formulation.  The parts of the deposition that we

10   had designated had to do with Mr. Plesent using diatomaceous

11   earth for other products for NXT, so I think since he read

12   those parts of the deposition --

13       THE COURT:  I agree.

14       MR. REGARD:  -- that he's opened the door on it.

15       (Bench conference concluded.)

16           (Defendant Exhibit 6 was admitted.)

17       MR. REGARD:  Your Honor, we would call Mr. Plesent again.

18       THE COURT:  All right.  You may ask.

19       MR. REGARD:  We're on page 37, line 13.

20       MR. VANCE:  Thank you.

21                       REDIRECT EXAMINATION

22   BY MR. REGARD:

23   Q.   So at the bottom of the first page of Exhibit 15, it says,

24   has he even given the experiment formula for the new

25   deodorizing powder?  If so, I need it, please.  And produce by

1    Vermont Soap sequentially as Number 78, which appears to be a

2    formula; is that correct?

3    A.    Sure.  Yes, absolutely.

4         MR. REGARD:  Your Honor, during the deposition, it was

5    marked as Exhibit 9, I apologize for not replacing the sticker.

6    In your book, it ought to be Exhibit 15.

7         THE COURT:  In my book?

8         MR. REGARD:  Yes, sir.  We would ask the Court if we

9    could --

10        MR. VANCE:  Subject to the same objection previously,

11   Judge.

12        THE COURT:  Overruled.

13             (Plaintiff Exhibit 15 was admitted.)

14   BY MR. REGARD:

15   Q.    Now, would you have done this at the request of NXT

16   Generation Pet?

17   A.    So NXT Generation Pet said we want 20, might have said 22,

18   unique products.  And I guess my eyes bugged out because that's

19   way too much work.  It takes a long time to get a base right.

20   And he looked at me and he -- and he no, don't worry -- he said

21   no, don't worry.  Most of this stuff is off the shelf, right

22   off your shelf.  I said fantastic.

23        He said a couple of other things we're looking for.

24   Reference was made to a -- something that could be used when

25   your dog goes on the rug.  I suggested that a foaming hand soap

1  would be appropriate, that we had some good results with that.

2  And my recollection is Beth tried it and said that's not good

3  enough.  I said all right.  Well, let me try something else.

4  Tried something else.  Didn't work either.  Okay.

5      So we did not pursue this any further.  So it was an

6  experiment.  This experiment does contain diatomaceous earth.

7  It was an experiment we tried, it was rejected, it was never

8  made.

9  Q.   Okay.  You're saying it was rejected because it did not --

10 did not test well?

11 A.   It didn't work.

12 Q.   It wasn't rejected because it had diatomaceous earth in

13 it; is that correct?

14 A.   No, at that point I had an assumption that the deal was

15 going to happen, that diatomaceous earth was going to end up

16 being fine and we put it in there.  It was never brought to

17 market.

18     MR. REGARD:  Please turn to page 6 of 7.  In the

19 deposition, it is page 53, line 18 -- excuse me, page 5 of 7.

20     MR. VANCE:  I don't have a designation on page 53.

21     MR. REGARD:  We can start on page 6 of 7 then.

22     MR. VANCE:  I'm sorry.  I still need to know what page of

23 the deposition.

24     MR. REGARD:  I'm starting on line 19, so it would be

25 53, 19.

1        MR. VANCE:  Judge, can we approach?

2        THE COURT:  Approach, please.

3        (Bench conference on the record.)

4        MR. REGARD:  Am I looking at something in error?

5        MR. VANCE:  I don't have the designation on page 53.  I've

6   got no pink on there.

7        MR. REGARD:  Maybe I made an error, Your Honor.  I thought

8   we had designated it.  You have page 55, line -- okay, I'll

9   start right there.

10        MR. VANCE:  One moment.  I have a second objection to this

11   because that's opening the door, there's no question.  He just

12   wants to read an answer.

13        MR. REGARD:  Well, if -- we've actually done that already

14   previously with some of the designations, it's not the first

15   time we've carried through with an answer.

16        THE COURT:  Let him read the answer.

17        MR. VANCE:  Thank you, Judge.

18        (Bench conference concluded.)

19        MR. REGARD:  On page 6 of 7, please turn to the

20   designation that's marked the eighth designation.  Starting

21   with line 55, 19.

22   A.   So we made the experiment.  It didn't work very well.

23   That was my alternative formula.  And as he says, she says can

24   the three of us, most likely Ethan, myself and Nichole, get

25   together so we can come up with a new experiment and move on

1   with this product.  This is the last product in their line to

2   be finalized, and I said probably not.  Anything natural we

3   would use that was deodorizing, really deodorizing, in the

4   sense of, Beth, what she called scent suppression, okay,

5   anything that's really going to work that's natural is going to

6   be too similar to Ken's formula.

7       We already tried my alternative formula unsuccessfully.

8   Jason needs to cut a deal with Ken if he wants this.  End of

9   story.  We're not -- I put my foot down.  I'm not going -- I'm

10  not doing anything with DE.  I'm not doing anything that looks

11  like Ken's formula.  Don't talk to me about it, don't ask me to

12  do anything with this.  It's too close to Herd Guard's formula.

13  We're not doing anything that is too close to Herd Guard's

14  formula.

15      And I'm not stating that I listed the ingredients when I

16  said that.  What I said was, this is too close to Ken's

17  formula, we're not going to do it.  And that was the end of it.

18      We never -- we dropped it.  We dropped the whole thing.

19  They took our pet spray, our camping spray, and were happy with

20  it.  We didn't do anything.  We did the dry shampoo, nothing

21  with any ingredients that Ken's formula used.

22      I was comfortable then, we were all comfortable.  We never

23  looked back.  We never discussed it again.  This was the

24  October 8th -- this was the end of it.  This is right where we

25  just like don't even -- I'm not doing anything that even

KEN STEWART - DIRECT (REBUTTAL)                    32

1   remotely looks like Ken's.  Don't even talk to me and that's

2   the end of it.

3        MR. REGARD:  I don't have any further questions, Your

4   Honor.

5        THE COURT:  Mr. Vance.

6        MR. VANCE:  Nothing further, Judge.  All right.  Thank

7   you.

8        THE COURT:  Next witness, Mr. Regard.

9        MR. REGARD:  Your Honor, we would like to recall

10  Mr. Stewart to rebut some of the prior testimony.

11       THE COURT:  You may.

12       Previous oath will cover your testimony, Mr. Stewart.

13       You may ask.

14       MR. REGARD:  Your Honor, may I hand you a proposed Exhibit

15  18, please.

16       THE COURT:  Yes.

17                          KEN STEWART

18                   DIRECT EXAMINATION (REBUTTAL)

19  BY MR. REGARD:

20  Q.   Mr. Stewart, do you remember when Crystal was providing

21  testimony yesterday?

22  A.   Yes.

23  Q.   And some of the questions that were asked to her were

24  about the correspondence that was going back and forth about

25  various questions that were asked by Jason about the organic

                      KEN STEWART - DIRECT (REBUTTAL)

 1  certification.  Do you recall that?

 2  A.    Yes.

 3  Q.    And that email -- excuse me for one second -- this was

 4  Defendant's Exhibit 2, which was introduced yesterday, and

 5  reflected some of the -- I'm sorry, there's a little note on

 6  the side, but I don't want to show my note to the jury.

 7        Yesterday on Defendant's Exhibit 2, which was introduced

 8  to the jury, was an email from June 5th, where Crystal and

 9  Jason were discussing various issues such as how many stores

10  the product was in.

11        Do you recall that?

12  A.    Uh-huh.

13  Q.    Now, did NXT continue to negotiate with Herd Guard after

14  June 5th related to the asset purchase agreement?

15  A.    Yes.

16  Q.    And did Mr. Riccardi tell you after June the 5th that he

17  was no longer going to pursue the opportunity with Herd Guard?

18  A.    No.

19        MR. VANCE:  Objection, Your Honor.  He asked what

20  Mr. Riccardi told him.

21        THE COURT:  Sustained.

22        MR. REGARD:  Your Honor, I would move to admit Plaintiff's

23  Exhibit 18.

24        THE COURT:  Objection?

25        Let it be filed.

 1          MR. VANCE:  Judge --

 2          THE COURT:  Yes?

 3          MR. VANCE:  -- I apologize.  May we approach?

 4          (Bench conference on the record.)

 5          MR. REGARD:  I think I printed the wrong copy of it, it

 6     doesn't have a production number.

 7          Is that your objection, Mr. Vance?

 8          MR. VANCE:  Judge --

 9          THE COURT:  Let the record reflect that the parties are

10     present at the bench outside the presence and hearing of the

11     jury.  This is what happened in Judge Van Tatenhove yesterday.

12     Apparently one of his defendants threw up during the middle on

13     a Rule 11 colloquy.

14          MR. VANCE:  I sincerely hope I'm not planning to be there.

15          THE COURT:  Well, I may throw up at the next bench

16     conference.

17          MR. VANCE:  Lest I be accused of opening the door to

18     something that you've already ruled out, this email refers to

19     the asset purchase agreement and it is apparently attaching the

20     asset purchase agreement.

21          I don't know what Mr. Regard is planning to ask him about

22     it, but I -- you have already determined that matters related

23     to the asset purchase agreement are irrelevant and not

24     appropriate inquiry.

25          THE COURT:  Well, he backed out of the agreement.

KEN STEWART - DIRECT (REBUTTAL)

1      MR. REGARD:  I'm bringing it up to show that on June 29th,

2  they were still actively negotiating it because Mr. Vance tried

3  to cast doubt upon organic certification.

4      THE COURT:  Mr. Vance would do what?  Okay.  You can bring

5  it in for that limited purpose.

6      (Bench conference concluded.)

7      MR. REGARD:  Your Honor, may we show Exhibit 18 to the

8  jury?

9      THE COURT:  Yes.  For the limited purpose that I --

10      MR. REGARD:  Correct.

11  BY MR. REGARD:

12  Q.   Mr. Stewart, I've put in front of you Exhibit 18, it

13  should be on your monitor there.  Is this an email, if you turn

14  to the second -- to the middle of it right here, who is Johnny

15  Bolton?

16  A.   Attorney that we used to look at the paperwork and kind of

17  oversee us through it and make sure our confidentiality

18  agreements were correct.

19  Q.   And did you receive this email from Mr. Bolton on Monday,

20  June 29th, 2015?

21  A.   Yes.

22  Q.   In this email, was he forwarding to you an initial draft

23  of the asset purchase agreement?

24  A.   Yes.  He was working with NXT Gen's attorney refining it.

25  Q.   So as of June 29th, 2015, irrespective of the

KEN STEWART - DIRECT (REBUTTAL)

1    correspondence in the earlier June emails, you were still

2    negotiating actively with NXT to sell the Body Guard 360

3    product line?

4    A.    I was planning my retirement at that point, what I talked

5    to Jason about.

6    Q.    But you were still actively negotiating the sale?

7    A.    Yes.

8         MR. REGARD:  I have no further questions, Your Honor.

9         THE COURT:  Mr. Vance?

10        MR. VANCE:  No questions, Judge.

11        THE COURT:  Next witness.

12        MR. REGARD:  Your Honor, Herd Guard does not have any

13   other witnesses to call at this time.

14        THE COURT:  All right.  Thank you, Mr. Stewart.

15        Ladies and gentlemen, during your lunch recess, remember

16   the admonition of the Court.  Do not discuss this case amongst

17   yourselves nor allow anybody to discuss it with you.  Don't

18   make up your mind about this case because you haven't heard all

19   the evidence or the instructions of the Court.

20        You may be excused at this time for lunch.  Be back in the

21   courtroom ready to go at 1:15.

22        The jury has decided to stay in and not go lunch.  We'll

23   be in recess until 1:15.

24        (A recess was taken from 12:13 to 1:23 p.m.)

25

KEN STEWART - DIRECT (REBUTTAL)

1        1:23 p.m.

2        THE COURT:  Let the record reflect the parties are present

3    in the courtroom by counsel.  The jury is not present.

4    Mr. Vance, you have a Rule 50 motion?

5        MR. VANCE:  Yes, sir.  On behalf of the defendant NXT

6    Generation Pet, we do move for judgment as a matter of law

7    under Rule 50.  As the Court knows, to survive that motion as a

8    matter of law, plaintiff has to present sufficient evidence

9    that there is a converted -- controverted issue of fact on

10   which reasonable minds could differ.

11        In this instance, the plaintiff cannot meet the elements

12   of claims that they are presenting to the jury, because under

13   New Jersey law or Kentucky law, whichever is applied, the

14   elements are the same.  To prevail they have to prove a valid

15   contract, a breach of that contract by the defendant, and

16   damages resulting from the breach.  They have presented no

17   evidence at all of any actual damages that Herd Guard has

18   suffered as a result of claims that they have presented.  And

19   so because they have suffered no actual damages, Herd Guard

20   contends that they are entitled to essentially liquidated

21   damages under the terms of Section 7.1 of the mutual

22   nondisclosure agreement.

23        That agreement defines those damages as any financial gain

24   made by NXT Generation Pet or any associated party from a

25   breach of the non-circumvention clause, adding some words to

KEN STEWART - DIRECT (REBUTTAL)

1  explain that phrase, although they have presented evidence in

2  the form of a single document with no explanation of the amount

3  of purchases of goods and experiments and other services

4  provided -- this is not all goods, there are other things in

5  there -- by NXT Generation Pet from Vermont Soap.

6      They have made absolutely no showing of what any financial

7  gain would be to NXT Generation Pet or was to NXT Generation

8  Pet.  And that is a fatal flaw in their claim for damages.  The

9  $144,000 may be a financial gain to Vermont Soap, but it

10  certainly isn't a financial gain to NXT Generation Pet.

11     The Court, in the instructions that had been presented to

12  the parties, has provided the jury with a definition of

13  financial gain.  And it says that the term "financial gain,"

14  based upon its plain meaning under New Jersey or Kentucky law,

15  that is the appropriate way to define financial gain, is

16  ordinarily understood as the amount of total monetary damages

17  by which the revenue of a business exceeds its cost of

18  operating.  There is not a shred of evidence presented to the

19  jury in the plaintiff's case in chief as to what any financial

20  gain as defined by the Court would have been to NXT Generation

21  Pet.

22     The jury would be left entirely in the dark.  They would

23  be throwing darts at a board attempting to determine what the

24  amount of damages are as claimed by Herd Guard in this case.

25     And because of that, NXT Generation Pet submits that Herd

KEN STEWART - DIRECT (REBUTTAL)

1   Guard has failed, as a matter of law, to satisfy the elements

2   of its claim for breach of contract and that NXT Generation Pet

3   is entitled to judgment as a matter of law under Rule 50.

4        THE COURT:  Thank you.

5        Mr. Regard, your response.

6        MR. REGARD:  Thank you, Your Honor.

7        Herd Guard would say in response that it did present

8   testimony from Mr. Riccardi which stated that they did sell the

9   goods that were acquired from Vermont Soap.  There was

10  testimony that a markup that was discussed, was the 40 percent

11  markup, as far as Herd Guard was concerned, and we realize that

12  it is testimony from Herd Guard, but it is within the same

13  industry.

14       And there was also testimony from Mr. Plesent that that

15  was the amount of business that was done with NXT Generation.

16  NXT Generation didn't put any evidence on of what their costs

17  of operations were.  They didn't say what their cost of

18  operations are.  So at this point --

19       THE COURT:  Well, first off, it's not their case right

20  now.  It's your case.

21       MR. REGARD:  I understand it's my case.  But I would say

22  if they want to argue that the number is more de minimis, they

23  could have put on some information stating that they didn't

24  sell the products for any more than they bought them for, that

25  they sold them for a loss.  They didn't put any testimony on

40

BETH SOMMERS - DIRECT

1   like that.

2        The information we have is that they bought the goods,

3   they resold the goods.  They are in the business to make a

4   profit.  And a standard markup, at least as far as the types of

5   goods that Herd Guard was dealing with, is 40 percent, Your

6   Honor.

7        THE COURT:  Your motion for judgment as a matter of law is

8   denied at this juncture.  Let's show the jury in.  It's hanging

9   by a thread, because I think Mr. Vance is going to try to cure

10  that problem.

11       (Jury entered courtroom at 1:28 p.m.)

12       THE COURT:  Let the record reflect that the jury is

13  present in the courtroom.  We'll waive the poll of the jury.

14  Please be seated.  It sounded like you all were having too much

15  fun.

16       First witness, Mr. Vance.

17       MR. VANCE:  Call Beth Sommers, Your Honor.

18       THE COURT:  Previous oath will cover your testimony at

19  this time, Ms. Sommers.

20                        BETH SOMMERS

21                     DIRECT EXAMINATION

22  BY MR. VANCE:

23  Q.   Good afternoon, Ms. Sommers.  Would you state your name

24  again for the record.

25  A.   Beth Sommers.

BETH SOMMERS - DIRECT

1   Q.   And, Ms. Sommers, where are you from?

2   A.   Ardsley, New York.

3   Q.   Are you originally from New York?

4   A.   No.

5   Q.   Where are you from originally?

6   A.   Chicago.

7   Q.   And what is your current position with NXT Generation Pet?

8   A.   I'm president of the company.

9   Q.   How long have you been the president of the company?

10  A.   A little over a year.

11  Q.   You were asked yesterday if you have been an officer of

12  the company since it was founded.  You have been; isn't that

13  correct?

14  A.   That is correct.

15  Q.   But you didn't have a title as an officer?

16  A.   That is correct.

17  Q.   Let me ask you just a little bit about your background.

18  What is your general background and experience in business?

19  A.   In business, I have worked for various catalog companies.

20  I've worked for a company called Hammacher Schlemmer for many

21  years, my expertise was in product development and in

22  merchandising.

23  Q.   Do you have a background and experience in pet products?

24  A.   I do.

25  Q.   Can you tell us about that?

BETH SOMMERS - DIRECT

1  A.    In 1989, there was no way to bring a pet on board an

2  airplane.  And I worked with a woman named Gayle Martz, who

3  created a product and got -- we got authorization from Delta,

4  American, TWA and United, who were all in business at that

5  time, and we were the first people to allow pet -- to bring a

6  carrier that allowed a pet on board.

7  Q.    What was that product called?

8  A.    It's called the Sherpa bag.

9  Q.    Can you still buy Sherpa bags?

10  A.    Absolutely.

11  Q.    If you could, tell us what prompted you to start or to

12  develop NXT Generation Pet.

13  A.    My dog, I had a dog, and she was allergic to everything.

14  And I was trying desperately to figure out what she was

15  allergic to.  I took her to allergists -- she wasn't a fancy

16  dog, I got her from a rescue.  And I just -- we could never

17  figure out what was going on.

18      And she passed away from the allergies.  And I always

19  thought that if I could ever do anything to make it clear --

20  the label, there are no regulation or rules for how to label

21  pet products.  There's no ingredient requirements, nothing.

22  You can put anything you want on the label.

23      So I did some research and I found out that if it's USDA

24  certified organic, by law, you have to have the USDA approve

25  your labels.  And everything that goes into the bottle has to

BETH SOMMERS - DIRECT

43

1    be on the label.  So it was pretty revolutionary at that point

2    in time when I did it.  No one else was doing that.

3    Q.   Was it your intention in developing NXT Generation Pet

4    that the company would market certified organic products?

5    A.   Yes.

6    Q.   And in order to be called certified organic, what has to

7    happen?

8    A.   You have to get approval from the United States Department

9    of Agriculture that all of the ingredients being used are

10   submitted and are aligned with their regulations, as well as

11   the facility that the bottling is done is also certified and is

12   inspected twice a year by whoever the certifier is in that

13   vicinity.

14   Q.   What steps did you take then to start the company?

15   A.   I did a lot of research on what companies had the ability

16   to do a USDA certified organic product.  I also looked into

17   what products were in the market at the current time and if

18   they were widely shown.  So you would do market research in the

19   main stores that are pet stores.  There's very little in that

20   regard.

21   Q.   Did you have a particular business model that you wanted

22   to pursue?

23   A.   We wanted to do grooming, health and wellness.

24   Q.   Did you have an idea about how you wanted to create the

25   products?

BETH SOMMERS - DIRECT

1   A.   I knew I wanted to do private label because when you're a

2   startup and you don't have enormous amounts of capital to do

3   formulations, you usually go to someone who does formulations

4   and does private label that will allow you to then private

5   label your own brand.

6   Q.   What is private label manufacturing?

7   A.   It's where you take a product that's already on the shelf,

8   already marketed, already developed to your specifications, and

9   you put your label on it.

10  Q.   And how did you go about identifying potential private

11  label manufacturers?

12  A.   I Googled private label organic soap manufacturers.  That

13  was how I started.

14  Q.   When did you start doing that?

15  A.   I started that February, March of 2015.

16  Q.   Let me back up and just ask you a question.  Who is Jason

17  Riccardi?

18  A.   Jason Riccardi is a gentleman that I had worked with

19  previously and who I worked with and asked to be the president

20  of NXT Generation Pet.

21  Q.   Why did you want to involve Jason in the company?

22  A.   He was very good at marketing and at business development.

23  Q.   Now, going back to the suppliers, the private label

24  manufacturers.  What suppliers did you identify as

25  possibilities?

BETH SOMMERS - DIRECT

1   A.   Vermont Soap, Bradford Soap, Twincraft and Tropical

2   Products.

3   Q.   At the time you were doing the research, did you talk with

4   anyone in the company about these possible private label

5   manufacturers?

6   A.   Most no, because I was mostly taking care of all the

7   product development myself.

8   Q.   Did you have any conversations with Jason about the

9   suppliers that you had identified?

10  A.   Very briefly.

11  Q.   Now, when you were looking at private label suppliers,

12  what types of products were you interested in marketing?

13  A.   Mostly grooming, I was looking at shampoos and

14  conditioners, anything for teeth and ears.  And anything that

15  would help stop allergic reactions in pets.

16  Q.   Now, the suppliers that you identified through the Google

17  search, which of them came up on the first page of the

18  searches, if you remember?

19  A.   Vermont Soap.

20  Q.   Did any of the others come up on the first page?

21  A.   No.

22  Q.   But you identified them through the Google search also?

23  A.   It's all on the same page.

24  Q.   You have been asked why you have no notes or record of

25  your internet searches, why is that?

46

BETH SOMMERS - DIRECT

1   A.   Because when I'm doing internet searches and you know what

2   you're looking for, you can repeatedly go back and search and

3   scroll through whoever that search is and get the same, if not

4   more, identities of companies that you want to do work with.  I

5   can go on to this day and search for that exact same search and

6   all four of those companies will still come up.

7   Q.   Now, did there come a time when you visited some of these

8   potential suppliers?

9   A.   I visited all four of them.

10  Q.   So you visited -- did you visit Bradford Soap?

11  A.   I did.

12  Q.   Did you visit Twincraft?

13  A.   I did.

14  Q.   And did you visit Tropical Products?

15  A.   I did.

16  Q.   Now let me ask you about Vermont Soap.  There's been a

17  good bit of testimony that you paid a visit to Vermont Soap for

18  the first time in July of 2015; is that correct?

19  A.   That is correct.

20  Q.   Now, let me ask you, during the period of time from

21  February, March of 2015, and the next few months, you heard

22  Mr. Riccardi's testimony yesterday about there being twin

23  tracks.  Can you tell us a little bit about what he meant, if

24  you know, about there being twin tracks for the development of

25  NXT Generation Pet?

BETH SOMMERS - DIRECT

1    A.   So because we were a startup, we were looking at two

2    different ways of doing business.   I was in charge of product

3    development and developing a line of product that would have

4    the name Pura Naturals Pet on it.   Jason was more into business

5    development trying to see if there were other companies that we

6    could procure, if there was any other business development,

7    marketing that was applicable to what our goals were to form

8    the company.

9    Q.   And did your development of the product depend in any way

10   upon Mr. Riccardi's identification of potential companies or

11   products to acquire?

12   A.   No.

13   Q.   Now going to the visit with Vermont Soap, what was the

14   purpose of that visit, the July 8th visit, from your

15   perspective?

16   A.   From my perspective, we went up because I was going to

17   look at what products they had on the shelf, what products we

18   could do private labeling with.

19   Q.   And what was Mr. Riccardi's purpose in talking with

20   Vermont Soap?

21   A.   He was going up to discuss, I suspect, the Herd Guard

22   situation.

23   Q.   Did your discussions with Vermont Soap relate at all to

24   the Herd Guard matters?

25   A.   No.   I was walking around with Nichole and Alice.   And

BETH SOMMERS - DIRECT

1  Larry and Jason and those other gentlemen were sitting and

2  discussing other matters.

3  Q.   Tell us what Nichole and her colleague were showing you

4  when you were at Vermont Soap.

5  A.   So they had rows and rows of merchandise with their own

6  label for the Vermont Soap label on it.  Every single product

7  that we had in our line was on their shelf already.  So we

8  didn't create anything new at that point in time.  We were just

9  strictly putting our own label on their product.

10  Q.   Was this the same type of discussion that you had with the

11  other private label manufacturers when you visited them?

12  A.   Yes, it was.

13  Q.   And why did you pick Vermont Soap?

14  A.   The stand out about Vermont Soap, and everybody in the

15  industry knows this, is that their MOQs are lower than anybody

16  else.

17  Q.   What is an MOQ?

18  A.   Minimum order quantity.  So you could order as little as

19  50 or as much of as, you know, 10,000.  But the other factories

20  all required minimum orders of at least 2,500 to 5,000 units.

21  Q.   So there was no other supplier in the mix that could --

22  that you could call up and order 50 bottles of something?

23  A.   And there still isn't today.

24  Q.   Did the fact that Herd Guard was doing business with

25  Vermont Soap play any part in your decision or NXT Generation

BETH SOMMERS - DIRECT

1   Pet's decision to use Vermont Soap as a supplier?

2   A.    Not at all.

3   Q.    So NXT Generation did enter into a business arrangement

4   with Vermont Soap; is that correct?

5   A.    Eventually, yes.

6   Q.    What did Vermont Soap do for NXT Generation Pet?

7   A.    They private labeled 13 products for us over the two years

8   that we did business with them.

9   Q.    I'm not going to ask you to name all 13, but can you give

10  us an idea of what those products were?  The range of the types

11  of products.

12  A.    There were three different shampoos, liquid shampoos.

13  There was a dry powder shampoo.  There was two salts.  There

14  was a paw rescue, a nose rescue.  A puppy and a kitten shampoo.

15  Q.    Were all of these products that Vermont Soap already had

16  on the shelf that you could purchase?

17  A.    Yes.

18  Q.    Did Vermont Soap ever develop any products specifically

19  for NXT Generation Pet?

20  A.    No.

21  Q.    Was there ever any consideration that Herd Guard could

22  supply those 13 products to you?

23  A.    No.

24  Q.    To your knowledge, was it even possible that Herd Guard

25  could have supplied those 13 products?

BETH SOMMERS - CROSS

1    A.    No.

2    Q.    Did there come a point with respect to the Herd Guard

3    product that you learned that it could not be certified as

4    organic?

5    A.    It wasn't -- yes, there was a point in time Jason told me

6    that it couldn't be.  Because I was very strict about saying

7    that every single product had to be certified organic.  That's

8    what differentiated us from everybody else in the market.

9    Q.    And with the -- if the Herd Guard product could not be

10   certified as organic, was there any reason for NXT Generation

11   Pet to continue to have discussions about acquiring Herd Guard?

12   A.    No.

13   Q.    Was that fact alone enough to end any consideration of an

14   acquisition of Herd Guard or its product?

15   A.    Yes.

16   Q.    Ms. Sommers, I have one last question for you.  Did you

17   know that Vermont Soap was a manufacturer of private label

18   organic shampoos and soaps for pets before you had ever heard

19   of Herd Guard?

20   A.    Yes.

21        MR. VANCE:  Thank you, those are all the questions I have.

22        THE COURT:  Mr. Regard.

23                         CROSS-EXAMINATION

24   BY MR. REGARD:

25   Q.    Hello, Ms. Sommers.  How are you today?

BETH SOMMERS - CROSS

1    A.    Good.   Thank you.

2    Q.    Couple of questions to follow up Mr. Vance with.

3          A moment ago you stated that you did an internet search

4    and that you contacted at least two of the four companies

5    before you visited Vermont Soap.  Do you remember that

6    testimony today -- well, actually, you said that yesterday.  Do

7    you recall that?

8    A.    Uh-huh.

9    Q.    And then today you said you looked up four companies; is

10   that correct?

11   A.    Uh-huh.

12   Q.    And did you contact those companies after your internet

13   search?

14   A.    Some of them.

15   Q.    Okay.  So do you recall when I took your deposition on

16   July 27th, 2018?

17   A.    Uh-huh.

18   Q.    And I asked you:  When was the first time NXT Generation

19   determined that Vermont Soap was a potential vendor?

20         And you responded:  March of 2015.

21         My question was:  When you say March of 2015, on what

22   basis do you say that?

23         And you said:  I did an internet search of different

24   organic manufacturers for private label.  They came up first.

25         And then I asked you:  Did you call them?

BETH SOMMERS - CROSS

1        And you said:  I did not.  I did not call any of the

2   people.

3   A.    Uh-huh.

4   Q.    Do you recall telling me, when I took your deposition,

5   that you didn't contact anybody that you had looked up in March

6   of 2015?

7   A.    In March of 2015, that is correct.

8   Q.    Okay.  One second.

9        Were you part of the approval that was done by NXT to

10  approve the acquisition of Herd Guard?

11  A.    It was never approved.

12  Q.    It was never approved.  Okay.  You should have an exhibit.

13       MR. REGARD:  Does the witness still have the exhibit book?

14  Your Honor, I would like to present what's been previously

15  marked as Defendant's Exhibit 3.

16       THE CLERK:  Defendant's Exhibit 3?

17       MR. REGARD:  Excuse me, Defendant's Exhibit 10.  I don't

18  believe it's been admitted to the jury yet.

19       THE WITNESS:  There is no 10 in this book.

20       MR. REGARD:  Is it still in your book, Your Honor?

21       THE CLERK:  Plaintiff's Exhibit 10?  You said Defendant's.

22       MR. REGARD:  Plaintiff's Exhibit 10, and it's on the

23  screen, Your Honor.  I would move to admit Plaintiff's Exhibit

24  10.

25       THE COURT:  Is this an email?

BETH SOMMERS - CROSS

1    MR. REGARD:  Yes, sir.  It's an email dated June 4th,

2    2015.

3         THE COURT:  Got it.

4    Q.   Ms. Sommers, do you have in front of you Plaintiff's

5    Exhibit 10?  That is an email from Jason Riccardi to Crystal

6    Ryan on June 4th, 2015?

7    A.   Yes, I do.

8    Q.   Okay.  Doesn't it state in that email --

9         MR. REGARD:  I would like to show this to the jury,

10   please.

11        THE COURT:  You may.

12        THE CLERK:  I do not see it on the screen right now.

13        THE COURT:  I don't have it on my screen.

14        MR. REGARD:  One moment, please.

15        THE COURT:  Admitted.

16             (Plaintiff Exhibit 10 was admitted.)

17   BY MR. REGARD:

18   Q.   Ms. Sommers, I've handed you an email which has been

19   marked as Plaintiff's Exhibit 10.  It's an email from Jason

20   Riccardi.  And are you cc'd on this email?

21   A.   I am.

22   Q.   And it says:  Ken, good news.  I met with the shareholders

23   today and they approved the acquisition of Body Guard 360 by

24   NXT generation.  Isn't that what he says in the email?

25   A.   That is what he said.

BETH SOMMERS - CROSS

1   Q.   So it was approved by the shareholders; isn't that

2   correct?

3   A.   It depends what approved means to you, I guess.

4   Q.   So you think the -- you disagree with Mr. Riccardi's

5   statement here?

6   A.   I disagree in that it is taken -- that you're telling me

7   that I am saying that it was fully approved and done.  He was

8   approved to go forward with investigating.

9   Q.   Mr. Riccardi at this point was the president of NXT; isn't

10  that correct?

11  A.   Uh-huh, that is correct.

12  Q.   That was his correspondence to the representatives of Herd

13  Guard, right?

14  A.   Correct.

15  Q.   And you were copied on it, correct?

16  A.   Correct.

17  Q.   And did you send a clarification immediately to clarify

18  that?

19  A.   No, because I understand what this means.

20  Q.   Okay.  Does NXT only sell products that are certified

21  organic?

22  A.   At that point in time?  Yes.

23  Q.   Currently, as we sit here today?

24  A.   Currently.  No, currently we have expanded our product

25  line.

BETH SOMMERS - CROSS

1  Q.   And don't you sell a flea and tick product that is not

2  certified organic?

3  A.   Correct.

4  Q.   It's actually a natural product, isn't it?

5  A.   It's certified by the EPA.

6  Q.   But it is not a certified organic product, is it?

7  A.   You can't certify any product that uses the words flea,

8  tick or insect on the label.

9  Q.   And you understood Body Guard 360 was a product using

10 diatomaceous earth, and one of the benefits of it was that it

11 was to repel insects, didn't you?

12 A.   I knew it was a scent suppressant.  I did not know that

13 the big thing about it was insect.  We sold -- Larry had on his

14 shelf a spray called Outdoor Spray that was not -- he said had

15 nothing to do with the Herd Guard product.

16 Q.   And you carried that product, didn't you?

17 A.   We did.

18 Q.   You carried a camping spray, didn't you?

19 A.   No, that's the same item.

20 Q.   It's the same item, they called it a camping spray, right?

21 A.   No, they call it the Outdoor Spray.

22 Q.   And it was not certified organic, was it?

23 A.   Yes, it was.

24 Q.   But the product you have now is not certified organic?

25 A.   Correct.

BETH SOMMERS - RECROSS

1   Q.   Right?  So you don't carry just certified organic

2   products, right?

3   A.   No longer, no.

4        MR. REGARD:  I don't have any questions, Your Honor.

5        THE COURT:  All right.  Anything else, Mr. Vance?

6        MR. VANCE:  Just one thing, Your Honor.  Madam Clerk,

7   could I have Defendant's 4?  Thank you so much.

8                    REDIRECT EXAMINATION

9   BY MR. VANCE:

10  Q.   Ms. Sommers, the email that Mr. Regard asked you about,

11  what is the date of that email?

12  A.   June 4th, 2015.

13  Q.   I'm going to show you Exhibit 4, which came in yesterday,

14  and we were copied on this email.  This is the email where

15  Ms. Geis is stating that the pet wash is certified organic by

16  the USDA.

17       Were you copied on that email?

18  A.   Yes, I was.

19  Q.   And what was the date of that email?

20  A.   June 17.

21       MR. VANCE:  Thank you.  That's all I have.

22       THE COURT:  Any recross, Mr. Regard?

23                   RECROSS-EXAMINATION

24  BY MR. REGARD:

25  Q.   Ms. Sommers, we'll look at Defendant's Exhibit 4 again.

BETH SOMMERS - RECROSS

1   Do you understand when Herd Guard said "our manufacturer," they

2   were talking about Vermont Soap?

3   A.   I'm not sure what I believed then.

4   Q.   Not what you believed then, what you believe now.  Do you

5   understand that Vermont Soap was the manufacturer?

6   A.   Yes.

7   Q.   And you understood that Vermont Soap manufactured

8   certified organic material -- items; is that correct?

9   A.   That is correct.

10  Q.   And doesn't this email specifically state:  We -- and we

11  can also use that seal if we allow our manufacturer to handle

12  all of our bottling?

13  A.   What's the question?

14  Q.   Doesn't the email state:  We can use that seal if we allow

15  our manufacturer, meaning Vermont Soap, to handle all of our

16  bottling?

17  A.   Yes.

18  Q.   Wasn't Vermont Soap a certified organic facility?

19  A.   Some of it was, yes.

20  Q.   Wasn't that why you wanted to visit them, because they

21  were a certified organic facility?

22  A.   Yes.  Because they have the ability, yes.

23  Q.   So that was a correct statement, they have the ability to

24  manufacture certified organic products, right?

25  A.   Yes.

1          MR. REGARD:  Thank you.

2          MR. VANCE:  No further questions, Judge.

3          THE COURT:  Thank you, Ms. Sommers, you may step aside.

4      Next witness.

5          MR. VANCE:  That's the case for the defense, Your Honor.

6          THE COURT:  Any rebuttal testimony?

7          MR. REGARD:  I don't have any rebuttal testimony, Your

8      Honor.

9          THE COURT:  All right.  Counsel, approach, please.

10         (Bench conference on the record.)

11         THE COURT:  Wish to renew your motion?

12         MR. VANCE:  Yes, Your Honor.

13         THE COURT:  Overruled.  Do you want to do the instructions

14     now?

15         MR. REGARD:  Yes.

16         MR. VANCE:  Yes.

17         THE COURT:  This is a civil case, so there's just

18     defendant, plaintiff, right?  That's fine.

19         MR. REGARD:  Yes, sir.

20         THE COURT:  And closing, how long do you need?

21         MR. VANCE:  20, 25 minutes, maybe.

22         THE COURT:  Okay.  I'll let you know when you're within

23     five minutes of your 20 minutes.

24         MR. VANCE:  That's fine.

25         THE COURT:  How long do you need?

1      MR. REGARD:  I would say 40 minutes, Your Honor.

2      THE COURT:  What?

3      MR. REGARD:  40?

4      THE COURT:  40?

5      MR. REGARD:  Probably not.  It will probably go faster.

6  I'll go as fast as I can.

7      THE COURT:  Okay.  I instruct first.

8      MR. VANCE:  Yeah.  I just want to make sure that they're

9  not going to hear anything about evidence that didn't come in.

10  Okay.

11      MR. REGARD:  What evidence are you concerned about?

12      MR. VANCE:  About how you're going to explain damages when

13  there is no evidence of damages.

14      MR. REGARD:  I'm going to explain damages the same way I

15  explained it already.

16      THE COURT:  Okay.

17      (Bench conference concluded.)

18      THE COURT:  Members of the jury, now that all of the

19  evidence is in, it is time for me to instruct you about the law

20  that you must follow in deciding this case.  Please listen

21  carefully to everything I say.

22      Now that you have heard all of the evidence, it becomes my

23  duty to give you the instructions of the Court concerning the

24  law applicable to this case.  It is your duty as jurors to

25  follow the law as I shall state it to you and to apply that law

1    to the facts as you shall find them from the evidence in this

2    case.  You are not to single out one instruction alone as

3    stating the law, but you must consider the instructions as a

4    whole.  Neither are you to be concerned with the wisdom of any

5    rule of law stated by me.

6        Regardless of any opinion you may have as to what the law

7    is or ought to be, it would be a violation of your sworn duty

8    to base a verdict upon any view of the law other than that

9    given to you in my instructions, just as it would be a

10   violation of your sworn duty as judges of the facts to base a

11   verdict on anything other than the evidence in this case.

12       In deciding the facts in this case, you must not be swayed

13   by bias or prejudice or favor to any party.  Our system of law

14   does not permit jurors to be governed by prejudice or sympathy

15   or public opinion.  Both the parties and the public expect that

16   you will carefully and impartially consider all of the evidence

17   in the case, follow the law as stated by me, and reach a just

18   verdict regardless of the consequences.

19       This case should be considered and decided by you as an

20   action between persons of equal standing in the community and

21   holding the same or similar stations in life.  All persons

22   standing before the law are to be dealt with as equals in a

23   court of justice.

24       You must make your decision based solely on the evidence

25   that you saw and heard here in court.  Do not let rumor,

1    suspicions or anything else that you have seen or heard outside

2    the court influence your decision in any way.

3        The evidence in this case includes only what the witnesses

4    said while they were testifying under oath, the exhibits that I

5    allowed into evidence, the stipulations that the parties agreed

6    to and the facts that I have judiciously noticed.  I have not

7    entered any stipulations or made any judicial notices of the

8    facts.

9        Nothing else is evidence.  The lawyers' statements and

10   arguments are not evidence.  Their questions and objections are

11   not evidence.  My legal rulings are not evidence.  And my

12   comments and questions are certainly not evidence.

13       During the trial, I did not let you hear the answers to

14   some of the questions the lawyers asked.  As ordered, you must

15   completely ignore all of those things.  Do not even think about

16   them.  Do not speculate about what a witness might have said.

17   These things are not evidence and you're bound by your oath to

18   not let it influence your decision in any way.  Make your

19   decision based only on the evidence as I have defined it here

20   and nothing else.

21       Now, some of you may have heard the terms direct evidence

22   and circumstantial evidence.

23       Direct evidence is simply evidence like the testimony of

24   an eyewitness, which, if you believed it, directly proves a

25   fact.  For example, if a witness testified that he saw it

1  raining outside and you believed him, that would be direct
2  evidence it was raining outside.

3      Circumstantial evidence is simply a chain of circumstances
4  that indirectly proves a fact.  If someone walked into the
5  courtroom wearing a raincoat covered with drops of water and
6  carrying a wet umbrella, that would be circumstantial evidence
7  from which you could conclude that it was raining.

8      It is your job to decide how much weight to give the
9  direct and circumstantial evidence.  The law makes no
10  distinction between the weight you should give to either one.
11  You should consider all the evidence, both direct and
12  circumstantial, and give it whatever weight you believe it
13  deserves.

14      During the trial, certain testimony was presented by way
15  of deposition.  The deposition consists of sworn, recorded
16  answers to questions asked of the witness in advance of trial
17  by one or more of the attorneys.  The testimony of a witness
18  who, for some reason was not present to testify in person, may
19  be presented under oath in writing or on videotape.  Such
20  testimony is entitled to the same consideration as other
21  evidence and is to be judged and considered by you as to
22  credibility and weight, and otherwise other matters you can
23  think of in the same way as if the witness had been present and
24  testified from the witness stand.

25      The burden is on the plaintiff in a civil action such as

1   this to prove every essential element of his claim by a

2   preponderance of the evidence.  If you conclude that the party

3   bearing the burden of proof has failed to establish his claim

4   by a preponderance of the evidence, you must decide against him

5   on the issue you are considering.

6        What does a "preponderance of the evidence" mean?  To

7   establish a fact by a preponderance of the evidence means to

8   prove that the fact is more likely true than not true.  A

9   preponderance of the evidence means the greater weight of the

10  evidence.  It refers to the quality and persuasiveness of the

11  evidence, not to the number of witnesses or documents.

12       In determining whether a claim has been proved by a

13  preponderance of the evidence, you may consider the relevant

14  testimony of all witnesses, regardless of who may have called

15  them, and all the relevant evidence received in evidence,

16  regardless of who may have produced it.

17       As I showed you earlier, a preponderance of the evidence

18  would be something to make that scale tip slightly.  Some of us

19  may remember a teeter totter back in our days.  Well, remember,

20  if you had a big guy on one end of the teeter totter, it

21  took -- to get it -- anyway, you have to make that teeter

22  totter directly move to the plaintiff's side.

23       If you find that the credible evidence on a given issue is

24  evenly divided between the parties, that it is equally probable

25  that one side is right, then you must decide that issue against

1   the party having the burden of proof.  That is because the

2   party bearing this burden must prove more than simple equality

3   of evidence, or must prove the element at issue by a

4   preponderance of the evidence.

5         On the other hand, the party with this burden of proof

6   need prove no more than a preponderance.  So long as you find

7   that the scales tip in favor of the party with this burden of

8   proof that the party claims is more likely true than not true,

9   then that element will have been proved by a preponderance of

10  the evidence.

11        Now that I have said that you must consider all the

12  evidence, this does not mean, however, that you should accept

13  all of the evidence as true or accurate.

14        You are the sole judges of the credibility or

15  believability of each witness and the weight to be given to a

16  witness's testimony.  In weighing the testimony of a witness,

17  you should consider the witness's relationship to the plaintiff

18  or to the defendant; the witness's interest, if any, in the

19  outcome of the case; the witness's manner of testifying; the

20  witness's opportunity to observe or acquire knowledge

21  concerning the facts about which the witness -- about the facts

22  which the witness testified; the witness's candor, fairness and

23  intelligence; and the extent to which the witness has been

24  supported or contradicted by other credible evidence.  You may,

25  in short, accept or reject the testimony of any witness in

1    whole or in part.

2        Also, the weight of the evidence is not necessarily

3    determined by the number of witnesses testifying as to the

4    existence or nonexistence of a fact.  You may find that the

5    testimony of a smaller number of witnesses as to any fact is

6    more credible than the testimony of a larger number of

7    witnesses to the contrary.

8        A witness can be discredited or impeached by contradictory

9    evidence, by showing that the witness testified falsely

10   concerning a material matter, or by evidence that at some other

11   time the witness has said or done something, or has failed to

12   say or do something, that is inconsistent with the witness's

13   present testimony.

14       If you believe that any witness has been impeached, then

15   it is your exclusive province to give the testimony of that

16   witness such credibility or weight, if any, you may think it

17   deserves.

18       The law does not require any party to call as witnesses

19   all persons who may have been present at any time or place

20   involved in the case, or who may appear to have some knowledge

21   of the matters at issue in this trial.  Nor does the law

22   require any party to produce as exhibits all papers and things

23   mentioned in the evidence in the case.

24       Now, let me explain some things about your deliberations

25   in the jury room and your possible verdicts.  You must follow

1  these rules while deliberating and returning your verdict.

2      First, when you go to the jury room, you must select a

3  foreperson.  The foreperson will preside over your discussions

4  and speak for you here in court.

5      Second, it is your duty as jurors to discuss this case

6  with one another in the jury room and try to reach an

7  agreement.

8      During your deliberations, you must not communicate with

9  anyone or provide any information to anyone by any means about

10  this case.  You may not use any electronic device or media,

11  such as a telephone, mobile device, computer, or similar device

12  to communicate with anyone about this case or to perform

13  outside research until I accept your verdict.  You are only

14  permitted to discuss the case with your fellow jurors during

15  your deliberations.

16      Each of you must make up your own conscious decision, but

17  only after you have considered all the evidence, discussed it

18  fully with other jurors, and listened to the views of the other

19  jurors.  Do not be afraid to change your opinions if the

20  discussion persuades you that you should.  But do not make any

21  decision solely because the other decisions [sic] think it's

22  right or simply to reach a verdict.  Remember at all times you

23  are judges of the facts.  Your sole interest is to seek the

24  truth from the evidence in the case.

25      Third, if you need to communicate with me during your

deliberations, you may send a note to me through the Court

Security Officer signed by the foreperson or another juror.  I

will respond as soon as possible, either in writing, orally or

in open court.  Remember that you should not tell anyone,

including me, how your vote stands numerically until the very

end of the case.

Fourth, your verdict must be based solely on the evidence

and on the law that I have given you in my instructions.  The

verdict must be unanimous.  Nothing that I have said or done

during this trial is intended to indicate or suggest what your

verdict should be, that is entirely for you to decide.

Finally, the verdict form is simply the written notice of

the decision that you reach in this case.  You will take this

form to the jury room, and when all of you have unanimously

agreed on your verdict, your foreperson should fill in the

form, sign it with your juror number, and bring it to me in the

courtroom.  Please advise the Court Security Officer that you

are ready to return to the courtroom.  However, do not give

your verdict form to the Court Security Officer or to anyone

else until I direct you here in the courtroom.

This case arises from a contract dispute between two

companies.  Plaintiff Herd Guard and defendant NXT engaged in

negotiations for NXT to purchase Herd Guard's Body Guard 360

product line.

As a part of that negotiation, Herd Guard and NXT entered

1    into two nondisclosure agreements.

2        In this case, Herd Guard claims that NXT violated the

3    nondisclosure agreements by doing business with Herd Guard's

4    third-party manufacturer, Vermont Soap, in violation of the

5    non-circumvention provision in the nondisclosure agreements.

6        In response, NXT claims that they did not violate the

7    agreement because they knew about the existence of Vermont Soap

8    as a third-party manufacturer for NXT before entering into the

9    nondisclosure agreements with Herd Guard.

10        Herd Guard is seeking damages as stated in the mutual

11    nondisclosure agreement.

12        Now I will explain the elements of the plaintiff's breach

13    of contract claim.  You will return a verdict for Herd Guard on

14    Count 1 if you are satisfied that the following elements are

15    met by a preponderance of the evidence:

16        Herd Guard and NXT entered into nondisclosure agreements

17    containing certain terms.

18        The identity of Vermont Soap as a third-party manufacturer

19    constituted confidential information under the nondisclosure

20    agreements preventing NXT from conducting business --

21    preventing NXT from conducting business concerning unrelated

22    matters with Vermont Soap.

23        Three, that NXT did not learn of the identity and

24    existence of Vermont Soap as a third-party manufacturer from a

25    source other than Herd Guard.

1      And, four, Herd Guard sustained damages as a result of NXT
2   engaging in a business relationship with Vermont Soap.

3      If Herd Guard has proved its claim by a preponderance of
4   the evidence, you must then determine the damages to which Herd
5   Guard is entitled.  You should not interpret the fact that I
6   have given you instructions about damages as an indication that
7   I believe that Herd Guard is, in fact, entitled to damages in
8   this case.

9      It is your task first to determine whether either
10   defendant NXT -- whether -- is to determine whether defendant
11   NXT is liable.  I am instructing you on damages only so that
12   you will have some guidance in the event that you decide that
13   defendant NXT is liable and that plaintiff Herd Guard is
14   entitled to recover money damages from the defendant.

15      If you find that the defendant NXT is not liable to
16   plaintiff Herd Guard, then you -- if you find that the
17   defendant NXT is liable to the plaintiff Herd Guard, then you
18   must determine the amount of damages.

19      In this case, the contracts in question contain a
20   liquidated damage provision stating that the amount of damages
21   to be awarded in the event of a breach.  The law allows for
22   liquidated damage provisions, provided that the provision for
23   such damage is not intended as a penalty or punishment, and
24   bears a reasonable relation to the damages that might actually
25   be sustained if the contract is breached.

1    Therefore, if you find for Herd Guard on the issue of

2  breach of contract, Herd Guard is entitled to the liquidated

3  damages as stated in the contract.  The amount of liquidated

4  damages to be awarded in a case of a breach is the financial

5  gain.

6    The term "financial gain" is based on its plain meaning,

7  is ordinarily understood that the amount of total monetary gain

8  by which the revenue of the business exceeds the cost of

9  operating.

10    I have a verdict form for you to use.  It says:  Do you

11  find by a preponderance of the evidence that NXT Generation Pet

12  Inc. breached the non-circumvention provision in one of the

13  nondisclosure agreements with Herd Guard, LLC?  Answer:  Yes or

14  no, and a place for your foreperson to sign.

15    If you agree yes to Interrogatory Number 1, proceed to

16  Interrogatory Number 2.

17    If you answered no to Interrogatory Number 1, sign and

18  date this verdict form on the last page and notify the Court

19  Security Officer that you are ready to return to the courtroom.

20    Interrogatory Number 2.  Please indicate the sum -- what

21  sum of liquidated damages Herd Guard, LLC has proven by a

22  preponderance of the evidence, which is defined as the

23  "financial gain" of NXT Generation Pet, Inc. as a result of the

24  breach of contract.  In other words, how much financial gain,

25  if any, do you find that Herd Guard proved by a preponderance

1  of the evidence?  You may assess damages against NXT only if

2  you answered yes to Interrogatory Number 1 above.  Liquidated

3  damages awarded to Herd Guard, LLC, amount of money and a

4  total.

5      After addressing Interrogatory Number 2, if necessary,

6  sign and date the verdict form on the last page and notify the

7  Court Security Officer that you are ready to return to the

8  courtroom.

9      And then on the last page is a place for the date and for

10 your foreperson to put his jury number.  Your deliberations are

11 now complete, please return to the courtroom.

12     The last thing that you're going to hear today about this

13 case will be the closing arguments of counsel.  They are not

14 really arguments.  They are basically trying to explain to you

15 what the evidence is in the case and how it pertains to their

16 claims.  That's all it is.

17     Before I started my instructions, I asked the lawyers how

18 long it would take for them to fairly argue their case and they

19 gave me their best estimate.  And I told them that when they

20 got within five minutes of their requested time, I would simply

21 say, "You have five minutes, Mr. Vance."  And Mr. Vance would

22 then, at the end of five minutes, if he's not completed, I will

23 say, "Thank you, Mr. Vance."  And that will be it.  Likewise,

24 I'll do the same for Mr. Regard.

25     I found that, by doing that, it becomes possible for me to

1    make sure that the lawyers do not become enamored with the

2    sound of their own voices, as they are prone to do.

3         So Mr. Vance, you may proceed.

4         MR. VANCE:  Mr. Marshal, may I?  May it please the Court,

5    Mr. Regard, ladies and gentlemen of the jury.

6         First, on behalf of Beth Sommers and NXT Generation Pet,

7    let me thank you very much for your service in this case.  Each

8    one of us cannot possibly tell you how much we appreciate the

9    fact that you've sat here for the last couple of days, taken

10   the time out of your busy lives to listen to us.  We know that

11   you did not choose to be here.  But your service as jurors is

12   one of the things that is most critical to the fundamental

13   rights that we have as Americans.

14        One of things I like about this courtroom is the

15   constitutional convention painting back there, and the right to

16   a trial by jury is in the Constitution.  It's incredibly

17   important.  And you are playing a very important role in this

18   country by serving as jurors and we really appreciate it.

19        This is my opportunity to sum up the case, as the Judge

20   said, on behalf of Beth and NXT Generation Pet.  Now,

21   throughout the entire trial, I've had to go second.  I got to

22   talk to you second, I got to give the opening statement second,

23   I've asked the witnesses questions second; and now, for the

24   first time, I get to go first.  And this is really when I want

25   to go second because I'm not going to get the last word.

1       So when I sit down, you're not going to hear from me

2   again.  I'm going to disagree with a lot of what Mr. Regard has

3   to say, so I hope you will remember the things that I am saying

4   now and will think, ah, well, Mr. Vance would say this to that.

5       You have to make the decision here.  You are in control.

6   And we believe that the correct decision in this case is a

7   ruling for NXT Generation Pet.  The issue that is before you is

8   very simple.  Now, some of the evidence in this case may well

9   have been confusing because it was about a series of contacts

10  and communications about a deal that was never completed.

11      But the bottom line for you, as the Judge explained, is

12  whether NXT Generation Pet knew that Vermont Soap was a

13  potential private label plaintiff of organic pet products from

14  sources other than Herd Guard.  The evidence shows that NXT did

15  have that information because it was freely available to anyone

16  who looked.

17      Now, yesterday I told you about Beth Sommers and her plan

18  for NXT Generation Pet, the fact that she developed it late in

19  2014.  She secured the investor, she began the work of creating

20  a pet products company that specialized in marketing organic

21  pet products for grooming, health and wellness.  She was going

22  to use her experience that you heard about in the pet business

23  and fulfill her dream of marketing this line of products.  It

24  was personal to her because of her experience as a pet owner.

25      Critical to that development was the use of a private

1    label manufacturer, and a private label manufacturer that made

2    organic pet products.  Thus it was always crucial from the

3    first point the business plan or the idea was developed, that

4    she know who the private label manufacturers were.  That's the

5    whole way she was going to do business in this company.

6         And so when she moved forward with the plan in early 2015,

7    she had to do research to determine what her options were in

8    terms of private label manufacturers.

9         As you heard, among the several companies that she

10   identified was Vermont Soap, a manufacturer, a well-known

11   manufacturer of soaps and shampoos based in Middlebury,

12   Vermont.  She told you that she found Vermont Soap the same way

13   that most of us look for information, she used Google and the

14   internet.

15        Vermont Soap was a great potential supplier because Beth

16   intended that all of the products would be certified organic by

17   the U.S. Department of Agriculture, and that was what Vermont

18   Soap was able to do.

19        It's very clear from the evidence that you heard that NXT

20   Generation Pet did not need Herd Guard to tell it about Vermont

21   Soap, to know that Vermont Soap was a potential provider of the

22   private label pet products NXT intended to market.

23        In fact, as you heard from Beth, she looked at other

24   manufacturers in the spring of 2015.  She researched Bradford

25   Soap, Twincraft and Tropical Products, and eventually she

1   visited all of those, just as she visited Vermont Soap.  And

2   all of that was essential to bring the products to market.

3        None of it, none of it was driven by the relationship with

4   Herd Guard.

5        As you heard, NXT Generation Pet was pursuing two pathways

6   to forming a company.  They were planning to develop their own

7   product line, that's what Beth was working on; and they were

8   looking for potential products or companies that they could

9   acquire, that's what Jason Riccardi was working on.  They were

10  separate pathways, they were not related to one another.

11       NXT Generation Pet would have found and investigated

12  Vermont Soap if it had never heard of Herd Guard.  And, in

13  fact, that's exactly what happened.  It learned of Vermont Soap

14  independently.

15       Mr. Regard may criticize the absence of any copies of

16  Beth's internet searches, but there was no reason for her to

17  save that information, as she explained to you.  She could

18  easily recreate it.  And at that time, she no idea she would

19  ending up sitting here today talking to you.

20       And, further, when you do these searches, as Mr. Plesent

21  said in his deposition, Vermont Soap does not hide their light

22  under a bushel, they are out there for anybody and everybody to

23  find.  So she knew she could always go back to that

24  information.  It was purely coincidental in this instance that

25  Vermont Soap was also doing business with Herd Guard.

1          Now, folks, there is no question that the relationship

2     between Herd Guard and NXT Generation Pet went sour.  But there

3     were many reasons for that, and none of them had anything at

4     all to do with Vermont Soap.

5          Rather, as you heard NXT Generation Pet's due diligence

6     uncovered a number of questionable statements and

7     representations made by Herd Guard.  Mr. Stewart claimed that

8     they were selling products in 90 stores when there was only

9     one.

10         Crystal Geis claimed the product was certified organic

11    when it clearly was not.

12         Mr. Stewart talked about the large number of sales, when

13    at most they were selling about $40,000 a year of the pet

14    product.

15         The product consisted of very few ingredients and the

16    formula could easily be cracked.

17         In short, the investigation that NXT Generation did of

18    Herd Guard convinced Jason Riccardi and Beth Sommers that they

19    did not want to acquire that product.

20         Now, as you heard, there were only two documents, two

21    agreements that were executed by NXT and plaintiff, the two

22    nondisclosure agreements.

23         One was the Herd Guard nondisclosure agreement.  It

24    contains two provisions that are at issue here.  Number one is

25    confidential information.  And it clearly says that

1  confidential information does not include information that is

2  known by the receiving party from a third-party source not --

3  I'm sorry -- prior to receiving the confidential information

4  from disclosing party.  So confidential information that does

5  not include information known by the receiving party, that's

6  NXT Generation Pet, prior to receiving the confidential

7  information from the disclosing party, Herd Guard.

8      It's also -- it also does not include information that

9  becomes rightfully known by the receiving party, again NXT

10  Generation Pet, from a third-party source, the internet, not

11  known by the receiving party to be under an obligation to

12  disclosing party to maintain confidentiality.  The internet has

13  no obligation to maintain confidentiality.

14      And then, lastly, this provision down here says, even if

15  you have confidential information -- and this isn't -- that

16  doesn't prevent you from developing business that is in direct

17  competition with Herd Guard.  Entirely appropriate for the Herd

18  Guard nondisclosure.

19      And then when you look at the mutual nondisclosure

20  agreement, it provides essentially the same thing with respect

21  to confidential information.  The obligations of nondisclosures

22  set forth in this agreement shall not apply to confidential

23  information which was in a party's possession prior to its

24  receipt from the other party or was received by a party in good

25  faith from a third party not subject to the confidential

1    obligation.

2         Those are the contracts, that is what governs the

3    relationship between Herd Guard and NXT Generation Pet.

4         Likewise, the agreements, as I said, don't prevent the use

5    of information that was publicly known.

6         Now, there is a dispute, we talked about it, as to who

7    drafted these NDAs, nondisclosure agreements, but you don't

8    have to decide that.  That's not the issue that's before you.

9    Good thing I was done with that.

10        Both of the agreements, though, clearly, plainly and

11   unambiguously state that both parties are freely able to use

12   information that they knew about before they signed the

13   nondisclosure agreements.

14        The sole issue for you to decide comes from Mr. Stewart's

15   contention that NXT Generation Pet only knew about Vermont Soap

16   because he told Jason Riccardi about Vermont Soap.  The

17   evidence you heard does not support that position at all.

18        First, Mr. Stewart testified people had heard about

19   Vermont Soap and anybody in the world could learn about Vermont

20   Soap from a Google search.  In fact, Mr. Stewart learned of

21   Vermont Soap through his own internet research and that's how

22   he found Vermont Soap in the first place.  You heard several

23   times about how Google helps you find it.

24        Further, Mr. Stewart freely admits that he disclosed the

25   identity of Vermont Soap as Herd Guard's supplier to potential

1   customers at trade shows and otherwise.  You heard his

2   deposition testimony as I read it to him.  He was clearly

3   talking about the Vermont Soap Company, not some generic

4   reference to soap made in Vermont.  He made no effort to keep

5   Vermont Soap as a supplier a secret.

6        In fact, he testified that it was good business to tell

7   people that he worked with Vermont Soap.  He told people that,

8   told buyers that at shows.  And he said he would tell people if

9   he didn't think they were a threat.  Which was an interesting

10  comment.  How do you know if someone approaches your booth, if

11  they're a threat or not?  But he would tell them that Vermont

12  Soap was the company.

13       You should also remember that the relationship between

14  Herd Guard and Vermont Soap was limited.  Herd Guard only

15  produced two products from Vermont Soap, shampoos for hunters

16  and pets.  And those were the products that Vermont Soap had

17  developed which had been filtered through the diatomaceous

18  earth for Herd Guard.

19       Furthermore, Herd Guard can't show that it ever had any

20  confidentiality agreements in place with Vermont Soap until May

21  of 2015.  For the entire time of the relationship between

22  Vermont Soap and Herd Guard, from 2010 to May of 2015, Vermont

23  Soap was free to tell the world it was doing business with Herd

24  Guard.  Herd Guard did nothing to keep confidential the fact

25  that Vermont Soap was a supplier.

1        So let's go back to why we're here.  You have seen that

2  NXT Generation Pet was well aware of Vermont Soap before

3  signing the nondisclosure agreements.  You've also seen that

4  Herd Guard did not accurately state its sales to NXT Generation

5  Pet.  You've also seen that Herd Guard's products did not

6  qualify to be certified as organic.  And you have also seen

7  that Herd Guard was disappointed that the potential purchase

8  transaction fell apart.

9        So let's look at the instructions that Judge Hood just

10  gave to you.  As Judge Hood stated, these instructions are the

11  law of this case.  Like many cases, you need to determine who

12  you believe.  Judge Hood has given you guidance on that.  You

13  need to consider what witnesses are believable.  Which

14  witnesses have been consistent in their testimony.

15        Mr. Stewart contradicted himself from what he said in his

16  deposition in several ways.  The question of who drafted the

17  NDAs.  He said he was confused about that.  What he told people

18  about Vermont Soap.

19        And there were also instances of misrepresentations during

20  the negotiations.  The 90 stores, for example.  Ms. Geis said

21  that either Mr. Stewart or Mr. Riccardi must have been confused

22  because there were never 90 stores selling the pet products.

23        Both Mr. Stewart and Ms. Geis said that they never told

24  anyone that their product was certified organic, yet you saw

25  the email, and you'll have it with you in the jury room, from

1    Ms. Geis to Mr. Riccardi where she flatly stated that the

2    product was certified organic.  Again, she told us she must

3    have been confused.

4         Conversely, there's not been a single challenge to

5    Ms. Sommers' credibility.  There were no instances where she

6    had to be corrected in her testimony.  Mr. Regard read one

7    portion of her deposition to her and she said, yes, that's

8    correct, what you just read is right.  In March of 2015, I

9    hadn't called anyone.  Her testimony has not been questioned at

10   all.

11        There were no instances of emails where she said something

12   that was untrue.  No instance where she said she was confused

13   about something.

14        Instructions Number 7 and 8 give you guidance in how to

15   consider the testimony and judge it from the witnesses.

16        Let's also look at Instruction Number 12, which you will

17   have.  You will have a copy of this with you in the jury room.

18   To find for Herd Guard, you need to conclude four things.

19   Number one, that the parties entered into the nondisclosure

20   agreements.  That's not disputed.  Nobody disagrees with that.

21        Number two, that the identity of Vermont Soap as a

22   third-party manufacturer was confidential information under the

23   nondisclosure agreements.  Clearly, it was not confidential

24   information as these two agreements define it.  Information

25   that was in NXT Generation Pet's possession before they signed

1   these agreements is, by definition, not confidential

2   information.

3      Third, that NXT Generation did not learn of the identity

4   and existence of Vermont Soap as a third-party manufacturer

5   from a source other than Herd Guard.

6      Again, the evidence here is very clear.  NXT Generation

7   Pet knew about Vermont Soap from other sources, the research

8   that Beth Sommers did and the publicity that Vermont Soap did

9   about its own business.

10      And, lastly, that Herd Guard suffered damages.

11      You have to believe all four of those things in order to

12   find for Herd Guard here.  And the evidence doesn't support

13   that finding.

14      Now, I don't want to spend too much time on damages

15   because we don't believe there's any basis for Herd Guard's

16   claims at all.

17      However, Herd Guard is claiming that it is entitled to

18   recover the "financial gain" to NXT Generation Pet from the

19   business that it conducted with Vermont Soap.

20      Now, you haven't heard a shred of evidence as to what that

21   so-called financial gain might actually be.  Thus, there is no

22   information for you to use in determining that there was any

23   financial gain to NXT Generation Pet at all.  And if so, what

24   that amount was.  All you heard is that NXT Generation Pet was

25   billed by Vermont Soap, total invoices that amount to about

1   $144,000.  Now, those invoices include lots of different

2   things.

3          THE COURT:  Five minutes, Mr. Vance.

4          MR. VANCE:  Thank you, Your Honor.

5          Experiments, samples, actual products from Vermont Soap

6   over a two-year period.  Presumably, because these are sales

7   from Vermont Soap to NXT Generation Pet, they represent a

8   financial gain to Vermont Soap, but they don't show you

9   anything about a financial gain to NXT Generation Pet.

10          There is no evidence, looking to the definition in

11   Instruction Number 14, of how you can calculate that.  It

12   plainly says, financial gain is understood as the total amount

13   of monetary gain by which the revenue of a business exceeds its

14   cost of operating.  There's not been a single piece of evidence

15   presented to you from that witness stand or on any document

16   that shows what NXT Generation Pet's revenue was over its cost

17   of operating.  You don't have it.  They haven't presented it

18   and they can't prove their case because of that.

19          You are going to hear Mr. Regard talk potentially about

20   Herd Guard's margin of sales.  There is no one who has come to

21   this courtroom and told you what the industry standard is.  You

22   haven't heard from an expert witness, you haven't heard from an

23   accountant, you haven't heard from anybody that tells you what

24   is ordinary, customary and normal in this business.  All you've

25   heard is what Herd Guard's margin might be.  Herd Guard's

1   margin has absolutely nothing to do with what NXT Generation

2   Pet's revenue over its costs was.  You have nothing with which

3   to judge that.  And because of that, you cannot make an award

4   of damages based on the instructions the Court has given you.

5        Folks, we have a very simple issue here.  A very simple

6   issue.  When did NXT Generation Pet know about Vermont Soap as

7   a potential manufacturer of organic pet products?  Based on the

8   evidence presented to you over the past two days, we believe

9   that you should conclude that NXT Generation Pet knew about

10  Vermont Soap before they knew about Herd Guard, and that Herd

11  Guard has no claim.

12       We ask that you answer Interrogatory Number 1 in the

13  negative and return your verdict to this court for NXT

14  Generation Pet.

15       Thank you again for your attention and for the diligence

16  that you have applied to your work as jurors.  We appreciate

17  it.

18       THE COURT:  Thank you, Mr. Vance.

19       You may proceed.

20       MR. REGARD:  Thank you, Your Honor.  Thank you, Mr. Vance.

21       Ladies and gentlemen of the jury, unfortunately for most

22  of the last two days I've had my back to you and I apologize.

23  I've had to look at the witness.  Today is only my second

24  chance to actually get to speak directly to you, and thank you

25  very much.  I appreciate how attentive you've been over the

1    last two days as we've done our best to present what we think

2    is a very straightforward and very simple case.

3        We believe in this case we have documents that support our

4    position.  We believe that NXT was a sophisticated business

5    organization, yet they have presented no documents which

6    indicate they were already aware of Vermont Soap as a

7    third-party manufacturer, nor did they present any documents

8    whereby they notified Herd Guard, when Herd Guard released this

9    information, that Vermont Soap would be an exception or a

10   carveout.

11       Herd Guard has taken all efforts to protect their

12   confidential information throughout their interaction with NXT.

13       This case is not about what Herd Guard told other people.

14   It's not what Herd Guard may have told somebody at a sale or a

15   show, a trade show.  This is about what did Herd Guard tell to

16   Vermont Soap and what did Vermont Soap know before it was told

17   to them.

18       And please keep in mind that once Vermont Soap finds

19   out -- excuse me -- once NXT finds out that Vermont Soap is

20   their manufacturer, they discontinue the relationship with Herd

21   Guard and they go into direct business with Vermont Soap

22   effectively cutting out the middleman.

23       Now, Mr. Stewart testified that he knew he was going to

24   create other products.  He knew there was a value to being the

25   middleman.  That's what he could bring to the table.  That was

1   valuable to him.  That's why he did not want to release it.

2       Herd Guard is literally a family operation.  You heard

3   from Mr. Stewart; you heard from his wife, Kim, at the time;

4   you heard from his daughter; you heard from his son-in-law.  It

5   was clearly a family, a small family in Garrard County,

6   Kentucky, who had come up with a fantastic concept and were

7   doing everything they could do to market that product.  They

8   didn't have the financial means to go into the broader market.

9   They were actively looking for investors or for potential

10  buyers of their company.

11      And when they identified somebody who was a potential

12  buyer, they made sure they had protection.  You heard Ms. Geis

13  describe how she had to argue with her father about releasing

14  information.  About even though she had already signed Herd

15  Guard, the nondisclosure agreement, Mr. Stewart still was

16  hesitant to release any information.

17      Mr. Stewart and Herd Guard, they are the creative force.

18  NXT, while they may have had a concept, they were not the

19  creative force.  All they were doing is looking for a

20  third-party manufacturer, products that they could buy off the

21  shelf.  And that's important because it means products that

22  already exist.  If you're buying them off the shelf, it's not

23  unique.  Organic products are not unique.

24      But what Mr. Stewart had was unique.  Herd Guard was very

25  protective of their confidential information in their

1   interaction with NXT Generation Pet.  And that's all that

2   matters.  It's that interaction.

3       It's also not the interaction between Herd Guard and

4   Vermont Soap.  That's not the contract that we're here to

5   discuss today.  The contract is the contract with NXT.  That is

6   who the mutual nondisclosure agreement is with.

7       As I said before, any information that was shared,

8   Mr. Stewart required a nondisclosure agreement to be signed.

9   And I have in my slide Vermont Soap, but I meant NXT.

10      Crystal said Ken was very adamant on not sharing

11  information.  The documents support not sharing information

12  before an NDA was signed.  And if you recall, on May 19th, it

13  was Beth Sommers who forwarded the mutual nondisclosure

14  agreement that included the non-circumvention language.

15      The reason you've been asked to sit on this jury and the

16  reason you've been asked to find the facts of this case are

17  specifically related to Section 7 of the agreement that NXT

18  Generation forwarded to Herd Guard by Beth Sommers, already

19  signed by Mr. Riccardi, requesting that Herd Guard sign it.

20      Yes, there was some confusion.  I believe Ms. Geis

21  explained that sometimes Mr. Stewart was a little bit confused

22  about the documents and that's why she handled the paperwork.

23      But let's put aside the testimonial confusion and look at

24  the documents.  There is an exhibit that you have, Exhibit 2,

25  which is the email that was forwarding the document -- excuse

1  me, it's Exhibit 7.  Exhibit 7 is the email from Ms. Sommers on

2  May 19th forwarding the applicable agreement already signed by

3  Mr. Riccardi.

4     In that agreement is the agreement that contains the

5  non-circumvention language.  After that agreement is forwarded,

6  Exhibit 2, Mr. Stewart signs it.  At this point, Herd Guard's

7  protected.  Yet they are still very slow to release

8  information.

9     It's not just about a nondisclosure agreement, it's also

10  about the larger agreement.  Mr. Stewart wants to know that he

11  has a deal before he released what he considers to be extremely

12  important, two pieces of information.  He doesn't want to give

13  his formula and he doesn't want to disclose his suppliers.

14     That document which was sent by NXT has no carveouts.  It

15  does not state these are the individuals that we're already

16  doing business with and there are no exceptions.  That's a

17  great business practice.  That would have put them on notice,

18  these are four companies that we're already doing business with

19  or contemplating doing business with.  That would have told

20  Mr. Stewart perhaps that there was a competitor that he was

21  dealing business with, not an acquirer.

22     You have to decide if you believe NXT when they say they

23  had already intended to do business with Vermont Soap when they

24  did not have any carves to what they themselves describe as the

25  punitive NDA that they had drafted and forwarded.

1          That language comes from Exhibit 8, which is

2    Mr. Riccardi's email to Crystal Ryan, which copied Ms. Sommers

3    and also copied Kim Smith, or Kim Stewart.

4          I have guessed that to be true, our current NDA is fairly

5    punitive, and we haven't stressed this very much, and broad.

6    It is meant to encompass a tremendous scope, suppliers.

7    Feeling protected, Herd Guard begins to share information, but

8    they don't share it very quickly.

9          As a matter of fact, when you look at Exhibit 9 -- excuse

10   me, Exhibit 9 was the presentation that was shared.  Here's the

11   presentation that describes the business, that was shared on

12   May 29th.

13         As Mrs. Geis testified, at the time the PowerPoint was

14   presented it did not include this supplier information, that

15   was later given.  If you recall, Exhibit 1 had a PowerPoint

16   which is landscape, but that supplier information that was

17   attached to the exhibit, which came from a deposition, was

18   portrait.  It was not part of the same document, according to

19   Ms. Geis' testimony.

20         This was the packet that was provided on May 29th,

21   describes Body Guard 360, describes it as a natural spray

22   solution.  So right there, they are being told it's natural.

23   It doesn't say on the front this is a certified organic

24   product.  It says it's a natural product.  They are not trying

25   to hide anything.

1    The confusion that Ms. Geis discussed on the pet wash was

2  a fair confusion.  She states specifically in the email, as I

3  highlighted during her testimony and during Ms. Sommers'

4  testimony, that their supplier was certified organic.  And it

5  had to be done there for it to be certified organic.

6    Exhibit 13, as of June 16th, Mr. Riccardi is still asking,

7  where are your suppliers located?  The only supplier they had

8  ever disclosed is Vermont Soap, that is the only supplier.

9  It's pretty self-explanatory in its name where it's located.

10 So on June 16th, they still don't know who their supplier is,

11 and that's Exhibit 13.

12   Then the supplier information is given.  Also the Amazon

13 login was given, the email, at that point all of the

14 information was given after June 16th.

15   Finally, after disclosing that Vermont Soap is their

16 supplier, Herd Guard notifies Vermont Soap that representatives

17 of NXT will be contacting them in order to arrange a visit.

18 Another important thing happens there.  You've heard testimony

19 that there's actually, on June 16th, before NXT comes to visit

20 Herd Guard, a confidentiality agreement entered between Herd

21 Guard and Vermont Soap.  Herd Guard is taking every possible

22 step it can take to protect itself and its confidential

23 information from what's been represented to them as the largest

24 pet company in the world, doing business with Blue Buffalo, who

25 wants to acquire their company.

1          Sure, Mr. Stewart put a million dollar number on the

2     table.  You heard testimony where it was not based on their

3     sales.  It was based on what they valued their formula at, what

4     they thought NXT could do by taking their formula and their

5     other relationships and growing it and expanding it.  They

6     thought they had finally gotten to a point where they had an

7     investor that could bring them where they needed to be.

8          I've put in the closing one of the exhibits that we

9     discussed today, and it's Exhibit 18.  This was the June 29th

10    email where the asset purchase agreement is still being

11    forwarded to Mr. Stewart.  So they have disclosed information

12    about their company, they've disclosed their supplier, they've

13    answered questions, they've answered the email of June 4th or

14    5th about how many stores are you in and there's a dispute.

15    And Mrs. Geis testified that they must have meant 90 stores for

16    the hunting, not necessarily 90 stores for the pet because

17    there was another line.

18         They have come to visit.  They've seen the facility,

19    they've met the principles, and they are still sending the

20    asset purchase agreement.  There is no concern about

21    misrepresentations.  There's no concerns at this point about

22    whether or not something can be certified organic.  At this

23    point, they are still expecting to do business with Herd Guard

24    because they haven't gone to Vermont Soap yet.  They know about

25    Vermont Soap now, but they haven't gone.

1    Because once they go, they decide to cut the middleman out

2    to make as much profit as they can, to utilize the confidential

3    information that Ken Stewart, through Herd Guard, told them,

4    that Vermont Soap is the company that you need that can help

5    you have your products to bring to market.

6        Now, what was interesting is, as you heard Mr. Riccardi

7    testify, that he took everything and packaged it up after his

8    visit on July 8th and sent it back to Herd Guard, you heard

9    Herd Guard testify that they really didn't know what was going

10   on.

11       However, on October 8th, Exhibit 18 -- Exhibit 15, NXT is

12   doing the experiments -- excuse me, Herd Guard is doing

13   experiments for NXT whereby they are using diatomaceous earth,

14   a product that Mr. Plesent testified he didn't use for anybody

15   else.  A product that he believed, as an upstanding

16   businessman, was unique to his relationship with Herd Guard.

17       So NXT has not told Vermont Soap yet as of October -- as

18   of the date of the email, as of October 9th, we're not doing

19   anything with Herd Guard.  Herd Guard's out of the picture.

20   They are still working with a supplier to try to take advantage

21   of the confidential information of Herd Guard.

22       Exhibit 9 is also an important exhibit -- I'm sorry, I

23   apologize, I left a page out of my presentation.

24       Mr. Vance told you in his opening that he is going to show

25   to you that Herd Guard told the world that diatomaceous earth

1   was their key ingredient.  There is simply no testimony about

2   that.

3       Now, he did put into the record Defendant's Exhibit 6,

4   which you haven't seen yet, it wasn't shown to the jury, it was

5   admitted by the Court, it will be available for you in the jury

6   box, which is a material safety data sheet, an MSDS.

7   Mr. Plesent testified that he was not certain that that

8   information had been provided to the public yet.  That was his

9   testimony.

10      But more importantly, when you look at Defendant's

11  Exhibit 6, which is an email which forwarded a formulation, it

12  has a lot of chemistry on it, it has some names on it, but it

13  does not say diatomaceous earth.  If you look to the next page,

14  once again, it has a chemical analysis, but it does not say

15  diatomaceous earth.  I think Coca-Cola was used as an example

16  somewhere earlier in this case, other natural flavorings.

17  Nobody knows what that is.  It's on their label.  Anybody who

18  buys food product will see a label.  That's similar to a

19  formula.  It's not unless you have the recipe.

20      But this isn't about the recipe and it's not about the

21  formula, but it is about protected confidential information.

22  In this case, there is no question that Herd Guard took every

23  step to protect that information.

24      And if NXT had, in fact, expected to do business with

25  Vermont Soap, they would have either disclosed that information

1    as a carveout, we could have avoided this litigation; they

2    would have produced a business plan that had it; they would

3    have contacted them before they went.

4        You heard testimony from representatives of Vermont Soap

5    that they had never had any conversations with the

6    representative of NXT prior to scheduling the meeting which

7    only took place after that information was disclosed by Herd

8    Guard.

9        We have documents, they have words.  It's easy for

10   somebody after the fact to say, I already knew that.

11       This is business.  You had a sophisticated business woman

12   who explained to you her background.  She did not disclose this

13   information nor does she have any document, correspondence or

14   business plan which says that Vermont Soap was a known

15   third-party manufacturer by NXT prior to the disclosure by Herd

16   Guard.

17       There's a lot of NDAs that you have heard about throughout

18   this litigation, two of them between NXT and Herd Guard.  There

19   was a reference in an email to one.  It was an email from

20   Mr. Riccardi, one with a company called Eco-Shell run by Helen

21   Cantrell.  You heard her name as the person who made the

22   initial contact at the 2015 Orlando Global Show.  And of course

23   there was a confidentiality agreement with Vermont Soap.

24       And I just realized I forget to mention one here.  There

25   was a second confidentiality agreement that Vermont Soap

1    testified to that they had NXT sign between the first and

2    second visit.

3        That's five agreements dealing with confidential

4    information.  Nowhere in any of these agreements does anybody

5    ever say, hey, we're already planning to do business with

6    Vermont Soap.  That's a carveout.  Before you disclose anything

7    to us, we're going to let you know, we already do business with

8    Vermont Soap.  You can imagine how Mr. Stewart would have

9    reacted if he knew that.

10       I know you understand this, but I just want to make sure

11   we're on the same page here.  NXT breached the NDA by entering

12   into a business relationship with Herd Guard's primary

13   supplier, Vermont Soap, after the mutual nondisclosure

14   agreement was signed.  That is how I would like for the jury to

15   answer that question when you go into the jury room.

16       Of all of the soap companies in the world, of the three

17   other companies that were described by Ms. Sommers, it's

18   Vermont Soap that they do business with.  And they don't do

19   business with Vermont Soap until after Herd Guard discloses it.

20       I would like to discuss damages.  The damages here are the

21   financial gain related to the NXT relationship with Herd

22   Guard's supplier Vermont Soap.  And that comes from Section 7

23   of the mutual nondisclosure agreement.

24       And you heard testimony from Larry Plesent that they had

25   approximately $144,000 worth of business relationship with --

1  between Vermont Soap and NXT.

2      You also heard testimony from Mr. Riccardi where I said:

3  were you dealing -- were you selling directly to end users when

4  you were at NXT?

5      No.

6      So you were only selling to distributors?

7      And he corrects himself:  Generally retail.  We may have

8  had an Amazon channel that made up a very small percentage of

9  our sales.

10      All right.  So you were selling to retailers?  Were you

11  using a distributor?

12      No.

13      All right.  So you were placing product directly with

14  retailers?

15      Yes.

16      And did NXT place private label products manufactured by

17  Vermont Soap with retailers?

18      Yes.

19      And there were sales of those products, right?

20      Yes.

21      As you go through what was presented at Plaintiff's

22  Exhibit 17, which will be in the jury room, you will see that

23  they continuously reordered products until this litigation

24  began.  Because they were selling those products.  You heard

25  some testimony from Mr. Stewart about the types of markups that

1    he presented to Vermont Soap for selling products in this area

2    of business.

3         We would ask that you take that information that you heard

4    today and that you apply it to the information in Exhibit 17

5    and the testimony, and that you find an award of damages to

6    Herd Guard in accordance with the violation of Section 7 of the

7    nondisclosure agreement that Vermont Soap did.

8         This is not terribly complicated.  This is very simple.  A

9    creative person, a creative force here in Kentucky, in Garrard

10   County, came up with a great idea, presented it at the first

11   global pet show they ever attended after they put together the

12   money to go.

13        Somebody comes to their booth who works with, you heard

14   testimony about Blue Buffalo, one of the largest pet companies

15   in the world, it's represented to them as the largest pet

16   company in the world, and they take that information that they

17   have, that information that's important to them, and they keep

18   it as close as they can until they think they have a deal done.

19        Because they are worried, they are scared.  And they know

20   if they give information, it might come to bite them.

21        And that is exactly what happened.  Even after they signed

22   these documents, after they slowly released information and

23   felt like they were protected, they still got cut out.  They

24   still didn't get paid.  And they had to come, file this

25   litigation and find ourselves here today.

1        So we ask that you go back into the jury room, that you

2    find for Herd Guard, and that you award the appropriate

3    damages.

4        Thank you very much for your time.

5        THE COURT:  Thank you, Mr. Regard.

6        Ladies and gentlemen of the jury, I'm going to send you

7    back to the jury room with all the exhibits, with a copy of my

8    instructions and a verdict form.  What I want you to do is to

9    go back and do exactly what I told you not to do, go back there

10   and talk about this case amongst yourselves and listen to every

11   juror and what they have to say and then come back and make up

12   your mind about it and let us know.  All right?

13       You may show the jury from the courtroom.

14       (Jury left courtroom at 3:04 p.m.)

15       THE COURT:  Let the record reflect the jury is out of the

16   courtroom.  We'll be in recess awaiting their return.

17       (A verdict was rendered; transcript not requested.)

18

19                     C E R T I F I C A T E

20       I, Linda S. Mullen, RDR, CRR, do hereby certify that

21   the foregoing is a correct transcript from the record of

22   proceedings in this above-entitled matter.

23   /s/Linda S. Mullen              August 23, 2019
     Linda S. Mullen, RDR, CRR      Date of Certification
24   Official Court Reporter

25

```
 1                          I N D E X

 2    WITNESS:                                   PAGE

 3    LARRY PLESENT                                6

 4    (Deposition read into the record.)

 5
      KEN STEWART (Rebuttal)
 6    Direct Examination By Mr. Regard            32

 7    BETH SOMMERS
      Direct Examination By Mr. Vance             40
 8    Cross-Examination By Mr. Regard             50
      Redirect Examination By Mr. Vance           56
 9    Recross-Examination By Mr. Regard           56

10    EXHIBITS                                ADMITTED

11     Defendant Exhibit 6                        27
       Plaintiff Exhibit 10                       53
12     Plaintiff Exhibit 15                       28
       Plaintiff Exhibit 17                       16
13

14

15

16

17

18

19

20

21

22

23

24

25
```